OF

# THE SUPREME COURT

OF THE

## STATE OF ILLINOIS,

### DECEMBER TERM, 1857, AT SPRINGFIELD.

---

EDWARD HAVEN *et al.*, Plaintiffs in Error, *v.* HILMAN
MEHLGARTEN, *et al.*, Defendants in Error.

#### ERROR TO ST. CLAIR.

Where several persons, their associates, heirs and assigns, are authorized to estab-
lish a ferry, and required to build approaches thereto, and to have the same
open, and kept and maintained for public use, by a certain time, and in a par-
ticular manner, etc., with right to charge ferriage and toll, upon certain conditions
as to keeping the same in repair, a corporation not being created, the parties, as
among themselves, are tenants in common of the property and franchises.
Some of the parties being absent, those who are present may maintain an action
in indebitatus assumpsit against their co-tenants or their heirs, for money neces-
sarily expended in the preservation of their common property and franchises,
and a special request to pay in such case need not be proved, but may be implied
from the peculiar relation of the parties and the beneficial nature of the acts done.

THE plaintiffs declared against defendants in assumpsit,
declaration containing one special and the common counts.

The special count alleges that plaintiffs, by regular convey-
ances and assignments, on the 16th day of November, 1852, had
become seized and possessed of one undivided half of certain
tracts of land, to which lands the legislature of Illinois, by an
act passed 12th of February, 1849, entitled "An act to establish
a ferry on the Mississippi river, in St. Clair county," had attached
a ferry privilege, of which privilege they had, by said convey-
ances, become also seized and possessed to the extent of one-half;
that, at the day first aforesaid, one Paul Mehlgarten was the
owner of the other half of said lands and ferry privilege; that,
as such co-tenants, they had become liable to the provisions of

the said act of the legislature, and also of an amendatory act, passed 12th February, 1851, and had in virtue thereof to locate and construct certain roads across the American Bottom, to erect a certain bridge over Prairie du Pont Creek, to establish and keep at said ferry sufficient boats; that said plaintiffs and their co-tenant, by said acts, were authorized to construct a plank road, and to charge toll as long as kept in repair, and obliged to build a certain stone dyke, on said lands, into the Mississippi river. Declaration avers that, up to the said 16th November, 1852, they and said Paul Mehlgarten, their then co-tenant, had complied with the requisitions of the said several acts, so far as they were compelled to do within the time for completion fixed by said acts, had made roads, erected dykes, established boats, and were running the same; that on the said 16th day of November, said Paul died; that defendants are his heirs at law, and, by descent, became seized and possessed of undivided half of said land and franchise, and became liable and subject to the terms, conditions, penalties and forfeitures provided by said acts.

The plaintiffs aver that, since the death of said Paul Mehlgarten, and up to the 9th of December, 1853, they remained co-tenants with defendants, and that during said time, at request of defendants, they expended large sums of money in running ferry boats, repairing and replacing them, building and repairing said roads and dykes, for the purpose of exercising and keeping up said purchase, amounting to $4,872.36, and that said defendants thereby became indebted to plaintiffs in one-half of that sum, which they, being so indebted, promised to pay.

To this and common counts defendants filed general issue and set-off, a demurrer to special count having been previously overruled. Upon the trial of the case, the plaintiffs proved all the material allegations in their declaration to the amount of one-half of $3,135. They did not prove, however, that defendants, who were proved to reside in Europe, either requested plaintiffs specially to incur said expenses, or expressly consented thereto. The plaintiffs, in order to show all the facts of the case, and that an express consent had been given, if such were necessary, called upon a witness and asked him what he heard the agent and attorney of defendants say in regard to the ferry and its management since the death of Paul Mehlgarten, which question the court overruled, and exceptions taken.

The defendants' counsel obtained from the court, SNYDER, Judge, presiding, the following instructions:

1. "If they believe, from the evidence, that plaintiffs and defendants were co-tenants in the ferry and ferry privileges, then, unless they believe further from the evidence, that defendants requested the plaintiffs to expend said money, or, after it

was expended, did make an express or implied promise to the plaintiffs to pay the same, they must find for the defendants.

2.   That if the jury believe, from the evidence, that the cause of action in this case, if any, arose out of money expended by plaintiffs, as co-tenants with the defendants, in running a certain ferry, then, unless they further believe, from the evidence, that the defendants requested said plaintiffs to expend said money, or, after it had been expended, did make an express or implied promise to pay the same, they must find for the defendants.

3.   If the jury believe, from the evidence, that all the money expended by the plaintiffs was as co-tenants, or tenants in common with defendants, and that defendants never requested the plaintiffs to expend the same, nor did make an express or implied promise to pay the same after it was expended, they must find for the defendants.

4.   The court is requested to instruct the jury that, if they believe, from the evidence, that the amount credited by the plaintiffs to the defendants is greater than the amount proved by the plaintiffs, then they must find for the defendants."

These instructions were all excepted to.

Jury found for defendants.   New trial moved—overruled—and judgment given for defendants.

By consent, this case was removed from the first to the second grand division.

G. Koerner, for Plaintiffs in Error.

G. Trumbull, for Defendants in Error.

Breese, J.   On the 12th day of February, 1849, an act of the General Assembly of this State was approved, entitled "An act to establish a ferry on the Mississippi river, in St. Clair county."   By the first section of this act, certain persons named therein, " their associates, heirs and assigns," were authorized to establish a ferry on the Mississippi river, opposite Carondolet, in Missouri, on Claim No. 207, Survey 108, and the privilege granted to ferry across that river, from that point, for the term of fifteen years, which right is made to extend two miles up, and two miles down, that river, from the point at which the ferry might be established on said claim and survey.

The ferry company, " their associates, heirs and assigns," were required to locate and construct a good road or causeway from the ferry, through the low land or sand-bar east of the ferry, in low water, to the main shore or high land, not to exceed forty feet in width, and thence eastwardly, across the American Bottom—the road to be a good one, sixty feet wide, intersecting the St.

Louis and Kaskaskia road at the nearest point at which that road approaches the ferry, and erect a good and substantial bridge across Prairie du Pont Creek, and are required to have this road open, and bridge built, and ferry erected, within three months from the passage of the act and right of way provided for.

It further declares (Sec. 4) that the company, their associates, heirs and assigns, shall erect and keep at the ferry a good and sufficient boat or boats, to be propelled by horse or steam power, safe and convenient to pass over the river all travelers, etc., speedily and without delay, and to receive such rates of ferriage for it as may be established for the ferry opposite St. Louis.

Section 5 provides: " In consideration of the construction of said road, and erection of said bridge, and keeping them in good repair, the proprietors of said ferry shall be exempt from paying a ferry license for said privilege of ferrying," with the *proviso*, " that if, at any time, the said proprietors shall neglect to keep said road and bridge in good repair, then they shall be liable to pay the said ferry license." And Sec. 6 provides: " Whenever the persons named, ' their associates, heirs and assigns,' manifestly fail or neglect to comply with the requisitions of this act, a reasonable allowance being made for high water and cases of emergency, the Circuit Court of St. Clair county may, on a full investigation of the facts and the evidence adduced, and in view of the justice of the case, declare this charter null and void." The remaining section, Sec. 7, authorizes them to make a plank road from the ferry landing, across the bottom, near the route of their other road, and charge a certain toll; but if it is suffered to remain out of repair, then no toll is to be charged.

On the 12th February, 1851, this act was amended by Sec. 1, extending the privilege to thirty years, and the exclusion, up and down the river, to three miles, from the north or south line of the survey. Sec. 2. A stone dyke is to be constructed, to extend from the Illinois shore or bank, into the river, three hundred and fifty feet, and a plank road of a certain description, and persons crossing this ferry not to pay any toll on the road—others to pay usual tolls. Sec. 3 requires those not crossing the ferry, who use the road, to pay the usual tolls. Sec. 4 provides a penalty against those who may establish a ferry within the prescribed limits; and the last section, Sec. 5, provides, " if the said dyke and plank road shall not be completed within two years from the passage of this act, the aforesaid privileges hereby granted shall be forfeited."

These acts, we must presume, were passed by the legislature, as well for the public good as to promote private interests.

They should unite in all public enterprises, the last being, doubtless, the most powerful incentive. No corporation, with name and seal, and power to sue and be sued, is created by the act, but a contract is entered into by the parties with the State, the burdens and benefits of which are to survive to their heirs and devolve upon their assigns, and by accepting these acts, and embarking in the enterprise, they agree to all the conditions. It was a great enterprise, connecting the suburbs of a great city with our industry and products, in which much profit was in reasonable prospect, as well as much advantage to the traveling and business community, all whose interests are to be greatly promoted by good roads, and safe and well managed ferries, to reach wealthy and populous cities.

A contract being thus created with the public, what was the relation created among the parties themselves? As to the land apart from the act, they were tenants in common, and by these acts they are made tenants in common also of the franchises created by them. *Livingston* v. *Lynch and others*, 4 John's Ch. R. 573. And so as to the boats and tackle, etc., they are also possessed as tenants in common and not as partners, by analogy to property in ships. Ships are declared to be chattels, of which the owners are possessed as tenants in common, and not as partners. Collyer on Part. 1017, sec. 1185; *Thorndike* v. *D' Wolf*, 6 Pick. R. 120. And such is the general doctrine recognized in all the books, though they may be held in partnership. This is the exception to the general relation. 6 Greenleaf, 77.

This, then, was the relation of the parties among themselves. They are tenants in common of the land—of the franchises granted, and of the vessels and machinery by means of which these franchises, or one of them, are to be exercised and enjoyed, and their contract with the public performed.

The franchises granted are supposed to be valuable, and a very serious question arises, how far may parties situated as these were—some on the spot, and some non-residents—go, in order to preserve them from losses and forfeiture? No case has been met on research, and none have been referred to, like it. At common law, by the writ of *de reparatione facienda*, now disused, one tenant in common of a house or a mill, might compel his co-tenants to join in the expense of necessary reparations belonging to them, whether one tenant was willing or not. Co. Litt. 54. In note (c) to 4 Kent's Com. 370, he says, "It has been suggested by a very respectable writer on this subject, that one tenant in common might, in an action of *assumpsit* for money laid out and expended, sue his co-tenant, who had received his share of profits, for his share of expenditures in necessary

repairs, on *the implied contract to refund.*" Gilbert on the Law of Dilapidations, p. 101.

In Louisiana it is held, (*Percy* v. *Millandon*, 4 Louisiana Cond. R. 84,)—perhaps under some provision in their code, though not so understood by Kent in his Commentaries, 371, and was in Chancery,—that " joint owners must contribute rateably to useful expenses incurred on the property by a joint owner having the management of it, when no opposition on their part has been made to such expenses."

As to part owners of ships, Kent says, " As the law presumes that the common possessor of a valuable chattel will desire whatever is necessary to the preservation and profitable employment of the common property, part owners, *on the spot*, have an implied authority from the absent part owners, to order, for the common concern, whatever is necessary for the preservation and proper employment of the ship. They are analagous to partners, and liable under that implied authority for necessary repairs and stores ordered by one of themselves, and this is the principle and limit of the liability of part owners." 3 Kent's Com. 155.

The record in this case shows that the plaintiffs are residents, and Paul Mehlgarten, now deceased, with whom they were associated, resided in Europe. The defendants, his heirs at law, also reside there, and have, at no time, assumed or exercised any control over, or management of the property, though owners of one equal moiety thereof. Had all these owners, by common consent, in the general management and conduct of the enterprise—building the roads and dykes, erecting bridges and operating the ferry, expended money or contracted debts on account thereof, there would be no doubt that all the part owners would be bound to contribute and pay their respective shares of such expenditures, and all of them would be liable *in solido* for the unpaid debts so incurred on the joint account. Story on Part., sec. 440.

But this case differs, very essentially, from any of the cases to which reference has been made in the authorities cited. Here were great and valuable privileges conferred by the legislature, to an association composed of residents and non-residents, owning each equal moieties, to be forfeited if certain acts were not performed, and about which, and how best to be performed, the foreign owner could not be supposed to be well informed. The ancestor of the defendants, through whom they derive title, seemed content, up to the time of his death, to leave the management of the enterprise to the resident proprietors, the plaintiffs in this suit. At his death, all his responsibilities, under the law, devolved upon them, with the hazard of losing vast and

valuable privileges. What duties then devolved upon the other joint owners, *on the spot,* how far could they act, what was it lawful for them to do to save their privileges, and by acting for such purpose, how far could they bind their co-tenants, or to what extent, if to any, can they be made liable? It is true, a writ of partition could be sued out, but during the tardy process of the law these important works are to be carried on to completion within a specified time, and the ferry constantly operated.

The declaration shows that the greater part of the expenditure, for which contribution is claimed, was incurred in relieving their ferry boat from a serious disaster—repairing it, running it, and replacing it; and that the entire account is for repairing the boat, and for repairs to the roads, bridges and dykes. Now, all these things had to be done, under penalties, and in doing them, the plaintiffs, being on the spot, were enabled to discharge their associated liability to the public. There was a public duty resting on them, to be discharged by them. It could not, surely, have been understood by any one of the original associates, or by those purchasing an interest in the franchises, that on the death of any one of them, the enterprise was to terminate or be arrested in its progress to completion, and thereby all the money they had expended, and the franchises also, be lost, or put in such peril as to render them nearly valueless ; or that one portion of the associates, no matter from what motive, could, by his own act, thwart the designs and operations of his fellows, bent on performing their obligations to the public, and on making the enterprise one of profit.

It seems to us, that after the death of Paul Mehlgarten, and before partition, the same responsibility rested upon his heirs as upon him, and that casualty did not destroy the association, as " heirs are provided for in both acts, nor should it cripple the exertions of those *on the spot,* who had, from the commencement, the management of the enterprise. Whatever sums of money they expended in good faith upon the leading objects of the association, and which were necessary in order to its enjoyment, and to the discharge of their obligations to the public, the heirs of Paul Mehlgarten, the defendants in this suit, are justly chargeable with their proportion.

It is objected, however, that the remedy, if they are liable, is in a court of equity. We think, as they are not partners, a court of law has jurisdiction, and *indebitatus assumpsit* is the proper form of action. There is a concurrent jurisdiction, and the plaintiff might have resorted to either. If a set-off be claimed by defendants, arising from profits, under our practice, the books of the association could be produced, or a bill of discovery filed, and no injustice in that particular can be done.

But it is said a request on the part of the defendants must be proved. We think the whole case is one of such a nature that a special request would be unnecessary, a legal obligation resting upon them which they are as much bound to discharge as the plaintiffs, and to which a special request could have imparted no additional validity or force. 2 Starkie on Ev. 53, 54.

In ordinary cases, though no contract for repairs be proved, yet if it be shown the work was done with the knowledge of the owner, he would be answerable on account of the benefit he is supposed to receive, and it will be presumed the work was done at his request. The proof in this case shows that the agent of the defendant was well informed of the operations, and did not forbid them nor attempt to arrest their progress; although he states he was not consulted, and should have forbid them had he been consulted, yet he did not forbid them, having the knowledge and the power to forbid them.

The court should have instructed the jury that the obligation rested equally upon the parties as associates, and no special request was necessary to be proved; that they could imply a request from the relation of the parties, the character of the enterprise, and from the beneficial nature of the acts done by the plaintiffs.

The question as to the manner in which the suit is brought, one portion of the joint owners joining as plaintiffs against the other part as defendants, it will be observed that the case shows that they had equal interests, plaintiffs having one equal moiety and the defendants the other, and the interests of the defendants, as between themselves, for aught that appears, equal also. It will, of course, be incumbent on the plaintiffs, on the trial, to prove their joint interest, and their expenditures, as associates; that the expenditures were made, as an association under the acts to which reference has been made.

The Circuit Court having entertained opinions different from those herein expressed, the judgment is reversed, and the cause remanded for further proceedings in conformity hereto.

*Judgment reversed.*