.[Filed March 25, 1885.]

# M. A. HACKETT *v.* THE MULTNOMAH RAILWAY COMPANY.

## AND

# THE MULTNOMAH RAILWAY COMPANY *v.* M. A. HACKETT AND NATHAN HACKETT.

FERRY LICENSE — ASSIGNABILITY. — Whether a ferry license is assignable without the consent of the granting power, *quære.*

CORPORATION — PARTNERSHIP — AGENCY. — The principle which prevents a corporation from being a partner with another corporation, or a natural person, is that in a partnership the act of one partner binds the firm, while a corporation can only be bound by the acts of its officers. '

ID. — COTENANCY IN A FRANCHISE — ACCOUNTING. — A corporation may be a joint owner of a ferry where not inconsistent with its constitution, and as such, entitled to share in its earnings, and to that end may have an accounting.

MULTNOMAH COUNTY. M. A. and Nathan Hackett appeal. Affirmed except as to the order dissolving the partnership, which is here held not to have existed.

The facts so far as material are stated in the opinion.

*James G. Chapman,* and *E. D. Shattuck,* for Appellant.

Survivorship in personal property has not been abolished in this State. (Code, § 9, p. 516, and § 38, p. 589.) The question of assignability or non-assignability of a ferry license under our statute is one of legislative intent. Nothing is to be deemed by implication to have been granted. (Sedgwick Stats. and Const. Con. 338, 339, n.; Cooley Const. Lim. 396.) Where a corporation has granted to it by charter a *franchise* intended in a large measure to be exercised for the public good, the due performance of those functions being the consideration of the public grant, any contract which undertakes without the consent of the State to transfer to others the rights and powers conferred by the charter, and to relieve the grantees of the burden which it imposes, is a violation of the contract with the State, and is void as against public policy." (*Thomas* v. *R. R.* 101 U. S. 83.) The authorities cited in 45 Mich. do not sustain the proposition that a ferry license is assignable. In every one of

them where the question is raised at all the contrary doctrine is recognized, unless by statute, as in Kentucky. *Blackwell* v. *Wiswall*, 24 Barb. 356 (affirmed at the Albany general term, March, 1857), and *Norton* v. *Wiswall*, 26 Barb. 618, cite and comment upon *Felton* v. *Deall*, 22 Vt. 170, and *Ladd* v. *Chotard*, Minor, 366, both cited in Mich. case, with numerous others, show that in an action for a tort the title to the ferry is not involved, and the question of assignability does not arise. *Bowman* v. *Wathen*, 2 McLean, 276, has been overruled by our Supreme Court in *Gant* v. *Drew*, 1 Oreg. 36. It was based upon the erroneous assumption that the ferry franchise issued out of and was a part of the realty adjoining the stream. In *Benson* v. *Mayor*, 10 Barb. 223, the only question was, whether several acts of the legislature' conferred upon the City of New York only the power to regulate certain ferries, or gave to the city a title of private ownership in the ferries. In *Dundy* v. *Chambers*, 23 Ill. 370, the statute having made the ferry right appurtenant to the soil, the court held that a deed was necessary to pass the title. The language of section 53, page 733, of the Code is so positive and direct a prohibition against anyone but the licensee operating the ferry that no room is left for conjecture as to what the legislative intent is. (*Blackwell* v. *Wiswall*, *supra*.) A corporation cannot form a partnership. (Angell & Ames Corp. § 272; Parsons Part. 29; *Marine Bank of Chicago*, v. *Ogden*, 29 Ill. 248; *Whittenton Mills* v. *Upton*, 10 Gray, 597–600.)

*C. B. Bellinger, J. M. Gearin,* and *P. L. Willis,* for Respondent.

The ferry was operated with the understanding by all the parties that the respondent was to pay two thirds of the expenses, and receive two thirds of the profits, if any, while the appellants were each to pay one sixth of the expenses, and receive one sixth of the profits. Such an agreement constitutes a partnership. (1 Parsons Cont. 5th ed. 147.) If part owners, not partners, fit out and equip a vessel for a common venture they thereby become partners. (Desty Shipping and Admir-

alty, § 32.) That a ferry franchise may, as against all parties, except the public, be sold, assigned, and transferred, has, we think, been settled by authority. (*Hackett* v. *Wilson*, 12 Oreg. 3, and cases cited; *Crolley* v. *Minnesota & S. P. R. R. Co.* 30 Minn. 541.) The County Court of Multnomah County, which originally granted this license, assented to the assignment to the respondent, by accepting respondent's bond as such assignee, and thereby the assignment became valid as against everybody. (*People* v. *Duncan*, 41 Cal. 508.) But even if the franchise were not assignable, or had not been assigned, there can be no reasonable question on the facts in the case, that the original licensees sold and assigned a two-thirds interest in the profits and emoluments of the ferry business, and that they had full right and power so to do. It has been held in cases of offices, wherein the franchise or office could *not* be assigned, that the emoluments or fees arising therefrom, or a part thereof, or interest therein, *might* be assigned. (High Receivers, § 22.)

LORD, J.—This case consists of two suits consolidated and heard as one in the court below, one of which was commenced by M. A. Hackett against the Multnomah Railway Company, J. H. Foster, and J. H. Moore, in which M. A. Hackett claims to be the sole owner of the property known as the "Albina Ferry," a ferry plying on the Willamette River between Portland and Albina, and asks that said company, and Moore and Foster, be restrained and enjoined from interfering with M. A. Hackett in the use of said ferry property, and that they account to him for tolls he alleged that they had received therefrom. Moore and Foster, claiming no interest in the property, made default, and the Multnomah Railway Company answered, claiming a two-thirds interest in the property, and asking the appointment of a receiver. The other suit was commenced by the Multnomah Railway Company against M. A. Hackett and Nathan Hackett, in which the company claims that it is the owner of two thirds of said ferry property, and that said Hacketts are each owner of one sixth thereof, and asks that the Hacketts be restrained from interfering with it in the

exercise of its rights as such owners. Nathan Hackett answered, disclaiming any interest, and M. A. Hackett answered, claiming the whole. In October, 1880, the ferry license was granted by the county court to M. A. Hackett and Norman Finch for the period of five years; subsequently the Multnomah Railway Company succeeded, by mesne conveyances, to two-thirds interest in the ferry; and from the time of such purchase until the present suits were instituted, M. A. Hackett (and in the same way Nathan Hackett) and the Multnomah Railway Company have operated the ferry by virtue of their joint proprietorship in the premises. The conclusions of fact and law, as found and determined by the court below, were against Hackett and in favor of the Multnomah Railway Company and hence this appeal by M. A. Hackett.

The counsel for the appellant contends that the principle to be determined is, whether a ferry license is assignable. His theory is that a ferry license is a special privilege conferred by the government on individuals, and which does not belong to the citizens generally of common right; and that therefore it is a personal trust reposed in the licensee, which is not assignable without the consent of the granting power. In *Hackett* v. *Wilson, ante,* we took occasion, under circumstances which reference to that opinion will explain, to review the authorities upon this subject; but this question was not determined, nor intended to be determined in that case. Speaking only for myself, as the writer of that opinion, I confess the impression strongly prevailed with me that a ferry license, as provided by our statute, is a personal trust reposed in the grantee, and is not assignable, by voluntary conveyance or otherwise, without the consent of the granting power. But for the purposes of this case, conceding this to be true, it is not perceived how it can avail the appellant, under the facts disclosed by the record. The county court from where the license was originally derived has assented to the assignment, and accepted the bonds of the respondent as such assignee; and thus it would seem the consent of the granting power has been obtained, and the objection to the validity of the transfer obviated. In *People* v. *Duncan,* 41 Cal. 511, the court say:—

"Waiving any opinion on the point whether a franchise is properly exempt from execution, in the sense of section 14 of the bankrupt law of the United States, and which, for that reason, would not pass to the assignee, it is obvious that if it is a personal trust, not assignable without the consent of the granting power, the assignee in bankruptcy does not acquire it by virtue of the assignment. He can take nothing which the bankrupt could not voluntarily assign, unless it be property previously conveyed to him in fraud of creditors or of the law. I am therefore of the opinion that the title of Jenkins did not pass to the assignee in bankruptcy. If this were the whole case, the defendant would be without title; but it appears from the finding that after the conveyance from the assignee to the defendant (Duncan) Jenkins acquiesced in the transfer, and not only relinquished all his title, but delivered the possession of the road and its appurtenances to Duncan. Subsequently the board of supervisors (from whom the franchise was originally obtained) not only assented to the transfer, but authorized Duncan to collect the tolls. Under the authorities already cited, this must be deemed a valid transfer of the franchise by Jenkins, with the consent of the granting power from whom it was originally derived."

The evidence shows that the right of the respondent in the ferry and its appurtenances after the transfer was made, was acquiesced in and recognized by the appellant; that for the purpose of successfully operating the ferry, the company managed the business; that the appellant and the other Hackett, who claimed some sort of interest, accepted employment from, and the wages fixed by, the company; that they turned over the gross earnings in the capacity of employees to the company, and that the company, being intrusted with the management, paid all expenses, including the wages, and accounted to such owners for their share of the rents and profits. The rights of the company being thus recognized under the transfer, and the assent of the granting power having been obtained, *People* v. *Duncan* is decisive of the question here raised.

The next question is one which presents more difficulty, and relates to the allegation of partnership set up by the respondent

in the answer to the first suit, denied by the Hacketts, but found to exist by the court below. The ferry license was originally granted to M. A. Hackett and Norman Finch; subsequently they transferred one third of each of their interests in the ferry to M. F. Mulkey, and they built the steam ferry boat Albina, and started the ferry. The evidence shows that these parties entered into written articles of copartnership, for the purpose of operating the ferry, in which it was provided that Hackett should be paid a certain sum monthly for his services in operating the boat, in addition to his share in the profits, after deducting expenses and losses, as a copartner. It would seem, after the transfer to the respondent, that they carried on the business together in accordance with their partnership agreement. There is nothing to indicate that it was formally adopted; but the management of the business and the conduct of the parties are consistent with that understanding. At least, the ferry was operated by the parties with the understanding that the respondent was to pay two thirds of the expenses of the business, and receive two thirds of the profits, and each of the Hacketts was to pay one sixth of the expenses, and receive one sixth of the profits; or one third, in this ratio, belonged to the Hacketts, without reference to any understanding existing in regard to it as between themselves. But certainly, if any partnership existed, as found by the court, it ought to have been dissolved.

It is apprehended, however, that the court below, in reaching the ultimate result, was less affected by mere technical rules than those general principles of equity adapted to the particular features of the case, and calculated to determine rightfully and justly the relations of the parties and their rights and interests in the premises. As we view it, it is immaterial whether the relation of partnership or that of simply co-ownership existed between the parties. The fact of ownership, and the rights of ownership, do not depend upon the relation of partnership between the parties. The relation of partnership arises out of contract between the parties, while a joint ownership in property may be created where there is no contractual relations. The objection to a part-

nership between a corporation and a natural person rests wholly upon the fact that, while in an ordinary partnership the act of one partner binds the other, yet, under the laws authorizing the formation of corporations, the latter can only be bound by the acts of its officers, and can only use its funds for the objects pre- scribed in the articles. "There is no general principle of law," says Mr. Lindley, "which prevents a corporation from being a partner with another corporation or with ordi- nary individuals, except the principle that a corporation cannot lawfully employ its funds for purposes not authorized by its constitution." (Lindl. Partn. 86.) But the court below may have proceeded upon the hypothesis that this objection would be obviated, or, at least, would not apply when there is a mere communion of interests in the profits of the business. There may be a partnership in the profits of a business, although one party is the sole owner of the goods and the other the sole man- ager of them. The capital may consist in the mere use of the property owned by the individual partners separately. (Colly. Partn. § 17, n.)

The respondent, having assumed the management of the busi- ness, and to be the managing owner of the property, and finding that there was nothing inconsistent in this with its charter pow- ers, the court evidently assumed that the relation of communion of interest in the earnings of the business was not inconsistent with the purposes for which the company was formed, nor with the exclusive power of the proper officers of the corporation to manage its affairs; and being tenants in common of the ferry property, that they might be partners in the profits of the ferry. This was consistent with the previous dealings and conduct of the parties under the old agreement and since the transfer, and would apply a just and equitable principle to the new agree- ment and settlement of their business. Assuming, however, that there was no parnership, it is clear that it was competent for the parties to become co-owners in the ferry (under the cir- cumstances already indicated), and as such to be entitled to share in its earnings; and that upon the exclusion of one by the other, a receiver would be appointed and an accounting had.

A receiver will be appointed of a steamboat when the owners dispute. (Edw. Rec. 331.)

The obligation of a partner to account with his copartner arises *ex contractu.* The obligation of a co-owner to account with the others for the profits which may have arisen from the common property cannot be based upon contract when no contract has been entered into, but it by no means follows, because there is no contract, express or tacit, to share profits, each co-owner ought to be entitled to get what he can, and to keep what he may get. This, it is said, was plainly enough seen by the Roman lawyers, who properly held an obligation to arise *quasi ex contractu,* and who found no difficulty in declaring that every co-owner ought to account to the others for the profits received by him, and contribute with them to the expenses properly incurred for the common benefit. So that it would seem, whether the relation of partners or co-owners exists, the rights of the parties are the same, at least so far as concerns the common property as such; and a co-owner, equally with a partner, may have an accounting and a receiver appointed.

In *De Witt* v. *San Francisco,* 2 Cal. 289, the court say:—

"The books do not afford an instance in which the right to hold as tenants in common, either with themselves or natural persons, is denied to corporations." "A tenancy in common may exist in every species of property, real, personal, or mixed. Two or more persons may, therefore, be tenants in common of a fixture, or of the right to use or convey water in a ditch. . . . So, too, a franchise may be held by two or more persons as tenants in common." (Freem. Cotenancy, § 88.)

In *Haven* v. *Mehlgarten,* 19 Ill. 91, it was held that "where several persons were authorized to establish and maintain a ferry, such persons were tenants in common of the land, of the franchise granted, and of the vessels and machinery by means of which these franchises, or one of them, is to be exercised and employed, and their contract with the public be performed" (see p. 95); and the court also say: "There is a concurrent jurisdiction in law and equity; and the plaintiff might have resorted to either." (Page 97.) The right of tenants in com-

mon to share in the profits of the common property, and resort to a court of equity for an accounting and a receiver in the case of exclusion by one tenant of another, would seem from the necessity of the case and obvious principles of justice to be authorized. "A court of equity has jurisdiction to appoint a receiver, at the instance of one tenant in common, against his cotenants, who are in the possession of undivided valuable property, receiving the whole of the rents and profits and excluding their companions from the receipt of any portion thereof, when such tenants are insolvent." (Freem. Cotenancy, § 327, citing *Williams* v. *Jenkins,* 11 Ga. 598.)

All these required facts appear in the case: the value of the property; in what such value consists; the exclusion and the insolvency of the parties in possession. As already stated, the company had the management of the ferry, and such management was acquiesced in and recognized by the joint owners. They accepted employment in the business at the hands of the company, and their compensation was fixed by the company. The gross earnings were turned over by them, in their capacity as employees, to the company. All expenses, including wages of such owners, were paid by the company, and the latter accounted to such owners for their share of the rents and profits. To this status of things thus existing the appellant, notwithstanding he had participated in the original transfer, and those subsequently made, as well as the possession of the respondent, and notwithstanding the large price paid in good faith, and the heavy expense incurred and laid out in improving and rendering the property more valuable and profitable, seems to have conceived the idea that he could appropriate the whole of the property, or that it reverted to him by reason of the invalidity of the transfer of the franchise. Upon the question of the account, the evidence has been carefully examined, and I am unable to detect any error in the result reached. My colleague, JUDGE THAYER, who sat with me in this case, after a patient and careful examination of the evidence, has reported a similar result. The causes were tried below by an able and experienced judge, and the result he reached meets our approval.

From what has been indicated, it follows that there is no necessity for an order of dissolution, as no partnership is found to exist. The court below is also directed to make an order for the receiver to report, and to discharge him if deemed proper under the circumstances of the case. In all other respects the decree must be affirmed.

WALDO, C. J., did not sit in this case.