Argued December 12, 1945; affirmed February 5, 1946

OSTLIND *v.* OSTLIND VALVE, INC., ET AL.
OSTLIND ET AL. *v.* OSTLIND VALVE, INC., ET AL.
(165 P. (2d) 779)

Before BELT, Chief Justice, and ROSSMAN, KELLY, BAILEY and LUSK, Associate Justices.

*B. G. Skulason,* of Portland, for appellants.

*William Hammond,* of Oregon City (Hammond & Hammond, of Oregon City, on the brief), for respondents.

LUSK, J.

These suits were brought by minority stockholders of Ostlind Valve, Inc., an Oregon corporation, to obtain relief against alleged fraudulent and illegal acts of the majority. In the first case the plaintiff is Oscar Joel Ostlind, owner of 215 shares of the capital stock of the corporation. The defendants are the corporation and eight of its directors. The latter will be hereinafter referred to as the defendants. The complaint alleges

that the defendants own and control more than two-thirds of the capital stock of the corporation and that the defendant E. Roy Jarman conceived and formulated a fraudulent plan, in which co-defendants collaborated, to bring about the purchase by the defendants Jarman and N. B. Williamson of certain physical assets of the corporation at a grossly inadequate price, and to enable Jarman and Williamson to acquire, without any consideration, a portion of the sum of $54,764.35 due and payable to the corporation from the Puget Sound Navy Yard. It is alleged that at a special meeting of the directors on February 21, 1945, the defendants, in pursuance of their fraudulent plan, adopted a resolution giving to the defendant N. B. Williamson a fifteen-day option to purchase said physical assets for $8,497.00 and the right to complete the Puget Sound Navy Yard job under which the corporation had already earned the said sum of $54,764.35, with the understanding that Williamson was to assume the lease on the company's building; and passed a motion calling for a special meeting of the stockholders on March 9, 1945, at 12:00 o'clock noon. It is alleged that the physical assets about to be sold are of the fair market value of $15,000.00 or more; that the job described in the resolution was completed before January 15, 1945, and the sum named then became and remains payable without further work, but that the defendants Jarman and Williamson are attempting to acquire a large portion of such sum by pretending that the job has not been completed and by making a colorable showing of completing it. Unless restrained by the court the defendants will attend the stockholders' meeting to be held on March 9, 1945, and, by virtue of their control of more than two-thirds of the capital stock of the corporation, will adopt a resolution approving the granting of said option.

The prayer is for a decree in favor of the corporation and against the defendants declaring their aforesaid acts fraudulent, null and void, restraining them as stockholders from voting at the proposed special meeting of the stockholders called to ratify the said acts of the defendants as directors, forever enjoining them from attempting to dispose of or to deal with the assets of the corporation in the manner described, and restraining them *pendente lite* from so doing.

The plaintiff made no application for a temporary restraining order and none was ever issued. The complaint was filed on March 2, 1945, and on March 14 the defendants filed their answer. They denied all the allegations of fraud in the complaint, and, after setting forth the minutes of the directors' meeting of February 21, 1945, at which the option to Williamson was authorized and the special stockholders' meeting was called for March 9 for the purpose of ratifying the action of the board of directors, alleged substantially that such stockholders' meeting was held on that day; that 1,441 shares were present in person or by proxy; that plaintiff Oscar Joel Ostlind attended the meeting and informed the stockholders that no further action had been taken in the suit brought by him than service of a copy of the summons and complaint on the defendants; and that a resolution approving the action of the board of directors was adopted by an affirmative vote of 1,012½ shares, 428½ shares voting in the negative.

No reply appears to have been filed to this answer, and on March 29, 1945, the second suit was filed by five stockholders, namely, Oscar Joel Ostlind, owning 215 shares; Benjamin R. Ostlind, owning 5 shares; Benjamin B. Ostlind, owning 3 shares; Maria E. Ostlind,

owning 171½ shares; and Genevieve Sengstacken, owning 12 shares. Subsequently, and before the trial, Genevieve Sengstacken withdrew as a plaintiff. The defendants are the corporation and nine of the eleven directors, of whom E. Roy Jarman is president of the corporation; Clifford Wolf the secretary; William C. Schmitt the vice president; and E. A. Burkitt the treasurer. The other defendants are W. A. Huntley, P. M. Sherlund, Lawrence Ray, N. B. Williamson, and George H. Wisting.

The same charges of fraud are made as in the first case and, in addition it is alleged that the fraudulent plan had been carried out by the ratification of the resolution of the board of directors at the special meeting of the stockholders on March 9; that the sale of the physical assets had been made to the defendant Williamson, and that he had assumed the lease on the plant of the corporation and taken possession thereof and paid to the corporation the above mentioned purchase price. It is alleged that the only portion of the aforesaid resolution of the directors which was not carried through was that relating to the completion of the Puget Sound Naval Yard job, which had already been completed.

It is further alleged that in furtherance of defendants' fraudulent plan the following resolutions were adopted at the directors' meeting held February 21, 1945:

"BE IT RESOLVED That Roy Jarman, as President, be authorized to conclude the sale of the patents for $100,000 earnest money, plus a five per cent royalty of the list sales price of the complete valves manufactured and sold. Roy Jarman is also authorized to negotiate a lease, should the royalty be as low as two per cent, although the asking price to start with should be five per cent."

"BE IT RESOLVED That Roy Jarman, as President, be authorized to allow George Wisting whatever out-of-pocket expenses he shall incur in promoting the sale of the patents."

"BE IT RESOLVED That Roy Jarman, as President, be authorized to spend $1,500.00 for advertising the sale or licensing of the Ostlind valve patents in national magazines."

"BE IT RESOLVED That Roy Jarman, as President, be authorized to spend an amount up to $2,000.00 for the purpose of making up copies of a prospectus of the Ostlind valve, which prospectus to be used in promoting the sale or licensing of the patents."

It is alleged that the corporation is now entirely out of business and that its only assets are "a sum of $54,000.00, or more, surplus net profits"; that the defendants, under the leadership of the defendant Jarman, intend to dissipate this fund by pretending to promote the sale of the Ostlind valve patents or in pretended negotiations for contracts to manufacture under such patents and thus to obtain these moneys for themselves to the injury of the plaintiffs as stockholders and that the defendants have already wasted $3,500.00 of the corporation's money by payments to the defendants Jarman and Wisting.

It is alleged that the patents mentioned are not the property of the corporation but belong to a certain trust in which the directors, as individuals, are heavily interested; that it is beyond the authority or power of the directors to sell such patents and *ultra vires* of the corporation to expend money to promote the sale of the patents, or to negotiate contracts for manufacture under them.

In the prayer plaintiffs ask that the defendants be restrained and permanently enjoined from taking any

action in accordance with the tenor of the resolutions above set out; that they show cause why a receiver of the assets of the corporation should not be appointed immediately; that they account to the court for all funds of the corporation in their possession; that defendants Wisting and Jarman be required to restore to the corporation all sums paid to them pursuant to the resolution of the board of directors of February 21, 1945, and that the corporation have judgment against them for such sums; that the directors be required to distribute to the stockholders "the aforesaid surplus net profits as dividends"; and that a receiver be appointed to take possession of the assets of the corporation and to supervise such distribution.

The answer of the defendants, as in the first case, denies the charges of fraud in connection with the sale of the corporate assets as well as the other alleged fraudulent acts and purposes. It sets forth affirmatively the history of the organization of the corporation and the nature of the trust under which the patents are held, and attaches as exhibits copies of the minutes of various stockholders' and directors' meetings bearing upon the questions at issue. These matters will be more fully stated in the opinion.

In lieu of a temporary restraining order the defendants, through their counsel, agreed not to take any action looking to the sale or licensing of the patents under the authority of the resolutions adopted at the directors' meeting of February 21, 1945, and it is our understanding that no such action has been taken. The cases were tried together and the court found that the charges of fraud had not been established and that the defendants had acted in good faith for the best interests of the corporation and its stockholders, and entered

decrees dismissing the suits. The court made no specific findings on the issues of *ultra vires* in the second case. The plaintiffs have appealed.

LUSK, J.

The sole object sought to be attained by the first suit was to enjoin the sale of certain corporate assets and the carrying out of the other purposes stated in the resolution of the directors' meeting of February 21, 1945, authorizing such sale, and to prevent the defendants Jarman and Williamson from acquiring for themselves any portion of the sum of $54,764.35, said to be payable to the corporation from the Puget Sound Navy Yard. That suit, according to the brief of the plaintiff, was brought in the right of the corporation to prevent an alleged threatened injury to the corporation. As stated, the plaintiff made no effort to obtain an injunction *pendente lite,* but suffered the threatened sale to be made, and, the sale being an accomplished fact, the question whether it should be enjoined has, therefore, long since become moot.

■ The second suit is not brought in the right of the corporation, but by minority stockholders suing on their own behalf. This we understand to be the theory of the complaint as stated by counsel for the plaintiff in his brief and on the argument. The complaint is wanting in allegations essential to the complaint of one bringing a derivative suit. It does not, for example, allege that the plaintiff is suing on behalf of all other shareholders similarly situated who wish to join. *Baillie v. Columbia Gold Mining Co.,* 86 Or. 1, 19, 166 P. 965, 167 P. 1167; Stevens on Corporations 655, § 162; *McAfee v. Zettler,* 103 Ga. 579, 30 S. E. 268. As a suit for the appointment of a receiver it is properly brought by the stockholders in their own behalf. *Rugger v. Mt. Hood Electric Co.,*

143 Or. 193, 219, 220, 20 P. (2d) 412, 21 P. (2d) 1100; *Baillie v. Columbia Gold Mining Co.,* supra, 86 Or. at p. 37. According to 11 Fletcher on Corporations (Perm. ed.) 816, § 5326, a suit to compel the declaration of a dividend should be brought in the right of the corporation, but, as there has been no attack on the complaint, we will consider the questions raised by the pleadings on their merits.

■ The plaintiffs have not prayed for the vacation of the sale to Williamson and Jarman and the restoration to the corporation of the property sold, and it is clear that that is a remedy which could not be granted here, but only in a suit brought in the right of the corporation for the redress of a corporate wrong. *Baillie v. Columbia Gold Mining Co.,* supra, 86 Or. at pp. 15, 16.

■ For like reasons, no judgment can be entered here, as prayed for in the second suit, in favor of the corporation and against the defendants Wisting and Jarman, for moneys alleged to have been wrongfully paid to them. See *Smith v. Hurd,* 12 Met. (Mass.) 371, 46 Am. Dec. 690.

Furthermore, the claim made in the first suit that the defendants Jarman and Williamson are "attempting to acquire for themselves an undetermined but large amount of said sum by pretending and representing that said job (i.e., the Puget Sound Navy Yard job) has not been completed and by making a colorful showing of completing the same" has now been abandoned. And it may be stated at this point that there is no proof whatever to support the allegation in the complaint in the second suit that the defendants had already wasted in excess of $3,500.00 of the corporation's money by payment to Jarman and Wisting.

Consequently, the only issues to be determined are

such as are properly before us under the allegations of the complaint in the second suit, and these are (1) whether the directors have been guilty of such fraud and mismanagement as would warrant a court of equity in taking the affairs of this solvent corporation out of the hands of the directors and placing them under the control of a receiver; (2) whether the court should order a declaration of a dividend; and (3) whether the directors are about to commit *ultra vires* acts which should be enjoined.

The following facts are disclosed by the record:

Ostlind Valve, Inc. was incorporated May 23, 1939, with a capital stock of 1,000 shares without nominal or par value. The incorporators were Oscar Joel Ostlind, one of the plaintiffs herein, and the defendants E. Roy Jarman, W. A. Huntley and William C. Schmitt. The principal purpose for which the corporation was organized was the manufacture and sale of a self-grinding valve, the invention of the plaintiff Oscar Joel Ostlind. The valve was patented to him in 1934 and again in 1940.

Joel Ostlind, as he is called by the witnesses, came to Portland in 1936 and induced the defendant William C. Schmitt, who was engaged in business as a steel fabricator, to finance the engineering of the valve and the manufacture of 200 valves in consideration of a twenty-five per cent interest in the patent. Finding himself in need of money for personal expenses, Ostlind enlisted the support of the defendant Jarman, an automobile dealer at Oregon City, who invested money in the enterprise and induced friends, some of whom are included among the defendants, to do likewise. Those advancing money to Ostlind were assigned interests in the patent. The defendant Williamson is a skilled

machinist. He had a machine shop in Portland, and Ostlind and Schmitt engaged his services and the use of his shop for the development of the valve.

The only one of the Ostlinds who invested any money in the enterprise is Maria E. Ostlind, the wife of Benjamin B., who paid Joel Ostlind $1,500.00 for an interest in the original patent. Her husband and their son, Benjamin R., acquired their shares by gift from her.

Before the company was incorporated in 1939, $19,500.00 had been invested in this preliminary work. Upon the organization of the corporation Oscar Joel Ostlind was elected president; the defendant Jarman, secretary-manager; and Benjamin B. Ostlind, vice president. Oscar Joel Ostlind and Benjamin B. Ostlind were put on the pay roll of the corporation, the latter as sales manager.

The normal course of assigning the patents to the corporation and capitalizing them was not followed. Instead, the subscribers to the capital stock, each of whom was granted interests in the patent equal in number to the shares of stock which he held, assigned such interests to the United States National Bank of Portland (Oregon) as trustee, and the bank, under date of June 9, 1939, executed a declaration of trust known as the Ostlind Valve Trust. In 1941 the authorized capital stock of the corporation was increased to 2,000 shares, no par value, and the number of interests in the trust (originally 1,000) was likewise increased to 2,000 and an amended declaration of trust was executed by the bank on February 3, 1941, covering both patents and a trade-mark. At the same time the owners of interests in the trust donated 500 interests to the corporation. Later the corporation's ownership was increased to 534 interests.

On February 3, 1941, the bank, as trustee, gave to the corporation a non-exclusive license to manufacture Ostlind valves for a consideration of twenty-five per cent of the net profits derived from the manufacture and sale thereof.

Under the terms of the amended declaration of trust (which are substantially identical with the original) the trustee was subject to the direction of a majority of the interest holders and was required, when so directed by a majority vote of the outstanding interests, to grant licenses to use, manufacture and sell the invention and to convey to such person or persons as such majority might by resolution designate, such title as should be then vested in the trustee. Net profits received by the trustee were to be paid to the holders of interests upon an equal basis. No assignment of an interest was to be accepted by the trustee unless reduced to writing and signed by the owner. The defendant Jarman was designated managing trustee, but his authority and duties were limited to presiding at the meetings of the interest holders, keeping a record of such meetings, and calling meetings.

By this time an additional $25,000.00 had been expended on the development, manufacture, and sales promotion of the valve, making $44,500.00 in all since the inception of the enterprise. But the business was meeting with no financial success. Permission was obtained from the corporation commissioner to sell to the public units consisting of one share of stock and one interest in the trust at $100.00 per unit. A selling campaign was inaugurated, and additional capital obtained—how much does not clearly appear. The corporation, however, continued to operate at a loss, and the financial statement of May 31, 1941, showed an

operating deficit for the first five months of that year in the amount of $4,211.62. At the directors' meeting held June 18, 1941, a resolution was adopted that "all present salaries excepting that of John Falconer shall cease as of June 15, 1941." The salaries of Oscar Joel Ostlind and Benjamin B. Ostlind were included in this resolution. By this time the defendants Jarman and Schmitt had become, respectively, president and secretary of the company.

With the approach of World War II the affairs of the corporation began to take a more favorable turn. War contracts were obtained principally for the manufacture of valves for the United States Navy—not, however, the Ostlind valve—and the sum of $54,000.00 or thereabouts, the disposition of which is here in controversy, is the fruit of such contracts.

On November 29, 1941, the corporation purchased from Williamson the tools, machinery and equipment (the resale of which to Williamson and Jarman in 1945 provoked this litigation) for $4,500.00, $750.00 of which was paid in cash, the balance of the purchase price being secured by a mortgage on the machinery payable in two years. Williamson reserved a first option to repurchase the property should the corporation desire to sell at any time within two years, for a sum of not less than $4,500.00. The mortgage was paid off in December, 1944.

From the beginning of 1942 the defendant Jarman acted as general manager of the company, but without salary until June, 1942, when he was voted a salary of $350.00 a month to commence as of June 1, 1942. The plaintiff Oscar Joel Ostlind, who attended the meeting of the board of directors which took this action, appears to have concurred in it.

We come now to the events which led up immediately to this litigation.

At the annual meeting of the stockholders held on January 15, 1945, the defendant Jarman, as president, reported in substance that the business outlook for the company was not as favorable as during the previous year; that, owing to the need of additional capital to finance the production of the Ostlind valve and the limited life of the patents, the board of directors had decided to license the patents or sell them outright; that this would be a good time to quit the manufacturing business; that, if the machinery were sold now a good price could be got for it, whereas, if the company waited until after the European war, it would be worth possibly fifty per cent of present value. A motion was then adopted authorizing the board of directors to sell or lease the machinery, fixtures and tools owned by the company with the exception of the filing cabinets, safe, all special tools and patents for making the patented Ostlind valves, and the company's shares in the Ostlind Valve Trust. Such sale or lease was to be subject to the vote of the majority of the board of directors. It was further voted to give N. B. Williamson the first opportunity to buy the machinery and that his bid, if equal to competitive bids, be considered first; and the board of directors was authorized to do whatever it could to further the sale or licensing of the patents owned by the Ostlind Valve Trust and to spend such sums of company money as should be deemed necessary to that end.

Holders of 1,468 shares of stock attended this meeting in person or by proxy. The minutes of the meeting state that the resolutions referred to were all unanimously carried, but it is the plaintiffs' evidence, and it

seems to be conceded, that the plaintiffs protested against the proposed actions and refused to vote. Apparently all the shares represented voted in favor of the resolutions except those of the four Ostlinds and twenty-two shares held by Bruce Cameron.

On the same day, that is, January 15, 1945, at a meeting of the owners of interests in the Ostlind Valve Trust attended by owners of 1,174½ interests and by a proxy for Ostlind Valve, Inc., then owner of 504 interests, a resolution was unanimously adopted authorizing the managing trustee, Jarman, to commence negotiations for the sale or licensing of the patents and trade-mark and empowering and directing him to sell them for not less than $100,000.00 earnest money and a percentage of the sales price for the balance of the patent years, and to pay not to exceed ten per cent commission on the earnest money to the salesman making the deal. Among those voting for the resolution were Joel Ostlind, Benjamin B. Ostlind, and Bruce Cameron. Mr. Cameron was that day elected to the board of directors to serve in place of Joel Ostlind. He was nominated by Benjamin B. Ostlind, and the nomination seconded by Joel Ostlind. He had rendered legal services to Joel Ostlind, who transferred to him twenty-two shares of stock and twenty-two interests in the trust by way of compensation for such services; and it is the testimony of Benjamin B. Ostlind that the Ostlinds wished to have him on the board to represent their interests.

On February 21, 1945, the board of directors met, with the following directors in attendance: Roy Jarman, P. M. Sherlund, W. A. Huntley, Lawrence Ray, Clifford Wolf, N. B. Williamson, E. A. Burkitt, William C. Schmitt, and Bruce Cameron. Directors George

H. Wisting and A. B. Peacock were absent. The resolutions above set out, providing for the sale and licensing of the patents and for the expenditure of corporate funds to that end, were unanimously adopted.

The minutes of the meeting state:

"The President stated that bids were open for the sale of the company's machines, tools, supplies, office fixtures, appliances, et cetera, with the exception of the four-drawer steel filing case, and the company's safe, together with all of the special tools that were manufactured to produce the patented Ostlind valve. The bid of the Premier Gear and Machine Works was $6,250, that of Portland Machinery Company was $8,497, and that of Palmer Weeks was $6,000. Mr. Bruce Cameron, a director, presented an appraisal made up by Mr. Spears of the Oregon Shipbuilding Corporation in which he had appraised this same machinery and equipment at $8,105.00."

A resolution was then adopted giving the defendant Williamson a fifteen-day option to purchase the physical assets above described for $8,497.00. The resolution concludes:

"It is understood that Mr. Williamson will assume the present lease on the company's building, and will pay the two-months rent which the company has advanced; also that he will take on the subcontract basis the present contracts which the company now holds, with the exception of Job Order D 687-D, with Puget Sound Navy Yard, which is now practically completed, and which he will complete on an hourly basis charge to the company."

The minutes show that all the directors present voted for the resolution except Williamson and Jarman, who did not vote, Jarman stating that he expected to have a financial interest in the transaction. Mr. Cameron testified that he did not vote on the resolution.

A special meeting of the stockholders was then called for March 9, 1945, at 12:00 o'clock noon to approve the proposed sale, and it was ordered that a copy of the portion of the minutes concerned with such sale be mailed to each stockholder on or before February 26, 1945.

At the stockholders' meeting held on March 9 (which, as above stated, was subsequent to the filing of the complaint in the first suit) there were represented in person and by proxy 1,441 shares of the 1,466 shares then outstanding. Ten hundred twelve and one-half shares voted for a resolution to sell the property to Williamson upon the terms stated in the resolution adopted at the directors' meeting of February 21; negative votes were cast by the shares owned by the four Ostlinds, Genevieve Sengstacken (12 shares), and Bruce Cameron, totalling 428½ shares. Jarman cast his 262 shares and Williamson his 36 shares in favor of the resolution. With their votes the resolution carried by more than two-thirds of the outstanding stock. Without them the affirmative vote was in excess of a majority of the stock represented.

Thereupon a bill of sale of the machinery was executed by the corporation to Jarman and Williamson and the purchase price was paid. Jarman and Williamson formed a partnership called "Jarman-Williamson Company", each contributing $5,000.00 to the capital, and have conducted their business on the premises theretofore occupied by the corporation. At the time of the trial, which commenced May 10, 1945, they were completing a $7,000.00 contract with the Puget Sound Navy Yard upon which the corporation had previously done about fifteen per cent of the work. Three other contracts, small in amount, were taken over from the

corporation. The partnership's statement showed a net operating loss for the period March 10 to April 30 of $456.11. Williamson testified that the class of work the partnership had to take was different from that which the corporation had engaged in and was not suited to the facilities of the shop or its manpower.

The partnership started with ten or eleven employees who had formerly worked for the corporation, and had nine employees at the time of the trial. The partners put themselves on the pay roll at $500.00 a month each, but Jarman testified that he had drawn no salary and Williamson that his salary was $500.00 a month "when he got it".

As above indicated, before the sale was made the directors sought competitive bids upon the machinery and equipment, and Mr. Cameron, who, as has been stated, was put on the board to represent the Ostlind interests, obtained an appraisal which was nearly $500.00 less than the highest bid and the sum for which the property was sold. The machinery included that bought from Williamson by the corporation in 1941 and additional machinery subsequently acquired. It was carried on the books at $23,401.15, depreciated to $10,264.01. The witness Spear, who made the appraisal of $8,105.00 at the request of Cameron, testified that his valuation was based upon the machines as they were on the floor without consideration of the cost of installation or of the fact that the shop was a going concern, and that, taking these matters into consideration, he would value the property at $15,000.00; that the cost of installation would be between $2,500.00 and $3,000.00. He stated on cross-examination that his figure of $15,000.00 was based on the assumption that the concern would continue to have war contracts. That

was an unfounded assumption, as the Navy had notified the corporation that it would receive no more contracts.

All the defendants testified in support of the sale. The evidence given by defendant Schmitt is of particular value. He has been in business as head of the Schmitt Steel Company, steel fabricators, for twenty-one years; he had worked with Joel Ostlind on the development of the Ostlind valve; and invested $8,500.00 in the enterprise. He considered the price at which the sale was made to Jarman and Williamson "very fair", and, when asked by counsel for the plaintiffs to explain why he voted to sell for $8,497.00 machinery carried by the corporation at something like $13,000.00, he answered "* * * we wanted to sell it, get the most out of it we could, and I have frequently in my own business sold equipment for less than we carried on the books because we knew we could not get that much out of it."

We are of the opinion that under the evidence the price paid for the machinery and equipment was fair and adequate.

We are further of the opinion that the charge that the defendant Jarman conceived and formulated a fraudulent scheme, in which the other defendants joined, to acquire the assets of the corporation at an inadequate price is not supported by the proof. On the contrary, the evidence demonstrates that the directors acted upon their own judgment and with a purpose to promote what they deemed to be the best interests of the corporation. Very likely Jarman was a dominant figure; he is a business man of large experience and mature judgment, and had been more active in the affairs of the corporation than the others. He no doubt commanded the respect of his associates.

He had invested a substantial sum of money in the stock of the corporation and considerable time and effort in its promotion. He had induced his friends to invest their money, and a strong motive with him, as the evidence indicates, was to pursue a policy which at least offered the possibility of returning to them their investment, with, perhaps, a profit.

■ He thought in January, 1945, and so in substance informed the stockholders, that the corporation should discontinue its manufacturing activities because the war, which was the occasion, and provided the opportunity, for the company's only profitable experience, was nearing its end, and that the machinery which had been used in filling war contracts should be sold before the market became glutted with the machinery of numerous other factories which were in like case. In our opinion those were honest judgments and were probably sound. He thought that the patents should be sold, and, as we have seen, the most active plaintiffs and the only ones who testified, Joel and Benjamin B. Ostlind, as well as Cameron, the representative of all the Ostlind interests on the board of directors of the corporation, voted, as owners of interests in the Ostlind Trust, in favor of a resolution authorizing Jarman to make the sale for $100,000.00 and an undetermined percentage of the sales price for the balance of the patent years. The position of the Ostlinds now is that the machinery and equipment, if sold at all—and they seem to think that a sale now is advisable—should be sold as a going concern. But, absent fraud, the question whether the machinery should be sold at all was one of corporate policy to be determined by the directors and the stockholders (§ 77-263, O. C. L. A.), and there is no evidence to warrant a finding that a purchaser could have been found to pay a better price on any basis than

that obtained. The failure of the plaintiff in the first suit to obtain an order from the court temporarily restraining the sale—an order which undoubtedly would have been granted—and the failure of the plaintiffs in the second suit to ask for a decree setting aside the sale or to bring the kind of a suit in which the court would have been authorized to set it aside, are significant factors from which it might not unreasonably be inferred that they were really willing that the sale should go through. As to the patents, it is the position of the Ostlinds, not that they should not be sold, but that they should be sold through brokers, rather than in the manner determined by the board of directors, in whom are vested the powers of the corporation except as otherwise specifically by law provided. § 77-218, O. C. L. A.

There is a suggestion in the plaintiffs' brief, apparently based upon opinions and predictions expressed by Benjamin B. Ostlind and Joel Ostlind when testifying, that Jarman believes that the valve can be manufactured profitably and has given himself authority to manufacture it on a royalty basis as low as two per cent and will proceed to do so. It is an empty charge unsupported by proof. As a prediction it is met by convincing evidence, concerning which there seems to be no dispute, that the Ostlind valve cannot be profitably manufactured except by a concern with large capital.

Giving an option to the defendant Williamson cannot be a proper subject of criticism. He had sold his machinery to the corporation in 1941 with the understanding that he was to have a job. He was about to lose the job, and the directors thought that, in these circumstances, he was entitled to be preferred as a purchaser before any outsider. Their decision to favor

him to that extent would not have justified them in acting to the injury of the corporation, but, as long as he was paying the best price obtainable, the corporation might well give him the first right to buy.

■ It follows that upon the first of the issues above stated, namely, whether a receiver should be appointed for the corporation, the plaintiffs ought not to prevail. This court has held that where fraud and mismanagement of the directors are shown the court may, if the need for such a drastic measure be sufficiently urgent, appoint a receiver even of a solvent corporation. *Rugger v. Mt. Hood Electric Co.,* supra, at p. 223; *Baillie v. Columbia Gold Mining Company,* supra, at p. 43. But, since fraud and mismanagement have not been established here, and since, in our opinion, a receivership would probably result in the dissolution of the corporation with loss to the stockholders, we think that the directors and stockholders must be permitted to continue to work out the destiny of the corporation.

We advert at this point to certain contentions put forward by counsel for the plaintiff, of doubtful pertinency to the receivership question, and which, indeed, are urged in support of a claim in the brief that the sale of the machinery and equipment should be vacated.

It is said that the sale is void, regardless of whether the transaction was fair and the consideration adequate, because it was a sale of all the assets of the corporation, which, under § 77-263, O. C. L. A., may be made only "with the consent of stockholders thereof holding of record as much as two-thirds of the issued capital stock of such corporation"; that Jarman and Williamson, by reason of their personal interest in the transaction, were disqualified from voting at the stockholders' meeting upon the motion to ratify the sale, and

that without their votes the necessary two-thirds was wanting.

The statute applies in the case of "a sale * * * of the business, franchise and property as a whole, of any corporation". It is arguable that it does not govern here, because Ostlind Valve, Inc., still retained after the sale ownership of a one-fourth interest in patents which all the stockholders hope can be sold for $100,000.00 and royalties, and which the corporation proposes to sell. The reasoning of the court, however, in *Matter of Timmis*, 200 N. Y. 177, 93 N. E. 522, makes that a debatable conclusion.

■ But we need not decide the question, because Jarman and Williamson were not disqualified from voting on the resolution of ratification, and, if a two-thirds vote was necessary, the resolution received it. The leading cases on the question are *Gamble v. Queens City Water Co.*, 123 N. Y. 91, 97, 25 N. E. 201, 9 L. R. A. 527, and *Northwestern Transportation Co. v. Beatty*, L. R. 12 App. Cas. 589. In both the court held that the personal interest of the shareholders did not disqualify them from voting, and it seems to be the accepted doctrine that, as the court said in *Gamble v. Queens County Water Co.*, supra, in a meeting of the shareholders "each shareholder represents himself and his own personal interests solely, and he in no sense acts as a trustee or representative of others." See, also, 6 Thompson on Corporations (3d ed.) 357, § 4478; 18 C. J. S., Corporations, 1166, § 489.

■ Neither was the sale void, as seems to be contended by the plaintiffs, because of the fiduciary relationship which Jarman and Williamson as directors bore to the corporation, for the rule approved by the great weight of authority, including decisions of this

court, is that a contract between the corporation and a director, where the director acts in good faith and the transaction is fair to the corporation, is not void but only voidable, and may be legally ratified by a meeting of the stockholders called for that purpose. *Marsters v. Umpqua Oil Co.*, 49 Or. 374, 378, 90 P. 151, 12 L. R. A., (N. S.) 825; *Stanley v. Luse*, 36 Or. 25, 34, 58 P. 75; *Ft. Payne Rolling Mill v. Hill*, 174 Mass. 224, 54 N. E. 532; *Wainwright v. P. H. & F. M. Roots Co.*, 176 Ind. 682, 692, 97 N. E. 8; *Twin Lick Oil Co. v. Marbury*, 91 U. S. 587, 590, 23 L. ed. 328; *Cowell v. McMillin*, 177 Fed. 25, 39 (C. C. A. 9th); 1 Morawetz on Corporations (2d ed.), § 527; 3 Fletcher on Corporations (Perm. ed.) §§ 913, 917. Such a contract, however, must be authorized by a disinterested majority of the directors. *Wainwright v. P. H. & F. M. Roots Co.*, supra; *Cowell v. McMillin*, supra; *Ft. Payne Rolling Mill v. Hill*, supra; *Higgins v. Lansingh*, 154 Ill. 301, 40 N. E. 362. And the contract will not be permitted to stand if the interested director participates in the making of it by voting for the resolution of the directors which authorizes it, at least where the vote of the interested director is necessary to carry the motion. Stevens on Corporations 572-575, § 143. We applied this principle to a resolution of the directors fixing the compensation of one of their number for past services in *Rugger v. Mt. Hood Electric Co.*, supra, 143 Or. at p. 218. See, also, *Amacher v. Western Realty Corp.*, 148 Or. 611, 630, 38 P. (2d) 64. In this case, as we have seen, Jarman and Williamson did not vote on the resolution of sale adopted by the directors.

■ It is the generally recognized rule that a stockholder may deal with the corporation if the dealing is fair and free from actual fraud; that there is no presumption of fraud in a contract between a corporation

and a majority stockholder, but that such contracts will be scrutinized with much greater care than if made with a third person. 13 Fletcher on Corporations (Perm. ed.) 173, § 5834; *Rothchild v. Memphis & C. R. Co.*, 113 Fed. 476; *Mumford v. Ecuador Development Co.*, 111 Fed. 639; *Taplin v. Commissioner of Internal Revenue*, 41 F. (2d) 454.

We have endeavored to give the plaintiffs the benefit of this rule in our appraisal of the evidence in the case before us.

*Enyart v. Merrick*, 148 Or. 321, 34 P. (2d) 629, and *Stanley v. Luse*, supra, relied on by the plaintiffs, do not support their position. In the former case the court held that a director had failed to establish a valid sale to himself of stock of other stockholders, as well as his own, which had been pledged to secure payment of a promissory note. In the latter a sale by a director to the corporation was annulled because it had not been ratified by the stockholders and because of concealment practised by the director. Both decisions recognize the fiduciary character of directors towards the corporation, but neither holds that the contract of a director with the corporation is void. On the contrary, as stated above, *Stanley v. Luse* approves the doctrine that such contracts are voidable only and may be ratified by the stockholders.

The next question arises upon the claim of the plaintiffs that the court should order the payment of a dividend.

■ The question whether a dividend shall be declared is ordinarily one of internal management with which the courts will not interfere. *Baille v. Columbia Gold Mining Co.*, 86 Or., supra, at p. 16. See 11 Fletcher on Corporations (Perm. ed.) 801, § 5325; Annotation,

55 A. L. R. 44-65. *Dodge v. Ford Motor Co.*, 204 Mich. 459, 170 N. W. 668, 3 A. L. R. 413, is a leading case illustrative of circumstances in which the court will compel the declaration of a dividend. In the Baillie case the allegations of the complaint were found to be insufficient to show that the discretion of the directors in this regard had been abused. It was not alleged that the corporate enterprise had been abandoned nor that the capital stock was intact, or that there were funds in the treasury except in a small amount. The capital requirements of the corporation were not set out, nor the probable expense of caring for its property.

Our statute makes it unlawful for directors to "pay dividends out of assets other than net profits or surplus", § 77-221, O. C. L. A. Plaintiffs say that the sum of $54,764.35, earned by the corporation in the performance of war contracts, constitutes "surplus net profits" available for distribution as a dividend. An examination of the balance sheet of the corporation dated March 9, 1945, indicates that to be a doubtful assumption, to say the least. Indeed, if it be true, as alleged by the plaintiffs, that that money is the only asset of the corporation, it may be seen at a glance that the assumption is very wrong, because on March 9, 1945, according to the balance sheet, the corporation had current liabilities of $15,509.07 and a capital stock liability of $33,600.00. We do not undertake to determine, and doubt whether it would be possible on the present record to do so, the amount of the corporation's "net profits or surplus", nor to explore the question of the meaning of those words as used in our statute. See, e.g., *Goodnow v. American Writing Paper Co.*, 73 N. J. Eq. 692, 69 Atl. 1014. It is, in any event, apparent that if the moneys on hand were to be

distributed to the stockholders—after the creditors had been paid, of course—it would amount in practical effect to a dissolution of the corporation, which may be what the plaintiffs desire although they do not say so.

It is the judgment of nine directors of this corporation that the welfare of the corporation will be subserved by continuing in business for the purpose of disposing to advantage of its interest in the patents, its only remaining asset apart from the cash on hand. They think that there is a reasonable prospect of selling the patents for $100,000.00 and royalties and that it is worthwhile to spend some of the corporation's money in the promotion of such a sale. In these views they are joined by a large majority of the stockholders, for at their annual meeting held on January 15, 1945, at which 1,468 shares of stock, owned by twenty-six stockholders, were represented, a resolution, authorizing the board of directors "to spend what sums of company money it deems necessary to further the sale and licensing of the patents", received the affirmative vote of all the shares represented save the Ostlind shares and those of Mr. Cameron. That action has never been rescinded and none of the stockholders, aside from the plaintiffs and Mr. Cameron, appeared upon the trial of these cases to aid the cause of the plaintiffs or to voice objection to the course determined upon by the directors. Included among the stockholders who have thus expressed their approval of the directors' policy are E. E. Gambee with an investment of $3,437.50; E. A. Burkitt, $2,500.00; Louis P. Gambee, $4,062.50; E. Hagen, $3,750.00; W. A. Huntley, $6,250.00; William C. Schmitt, $8,500.00; and others with lesser but substantial sums invested.

■ The Ostlinds, as witnesses, profess still to have faith in the invention. The only difference between them and the directors—apart from the question raised as to Jarman's good faith—is that the Ostlinds believe that corporate funds should not be expended for the purpose stated and that the sale should be made through brokers, and that whatever cash assets may remain should be divided among the stockholders. In our opinion, the court is not authorized in the circumstances of this case to overrule the decision of the directors, as well as of a preponderant majority of the stockholders, on a question of that kind. It was a decision having a basis in reason and one which they had the right to make. *Horner v. Pleasant Creek Mining Corp.*, 165 Or. 683, 699, 107 P. (2d) 989, 109 P. (2d) 1044. It may have been erroneous, but that is one of the risks which people take when they become members of a corporation. The case of *City Bank Farmers Trust Co. v. Hewitt Realty Co.*, 257 N. Y. 62, 177 N. E. 309, 76 A. L. R. 881, cited by the plaintiffs, presented a somewhat similar problem, and the court refused to interfere at the suit of a minority stockholder who demanded the payment of a dividend, saying:

"A court of equity will protect a minority stockholder against conduct of the directors which is in breach of the trust confided in them and injurious to the stockholders, but on questions of expediency the courts cannot assume to pass. Such questions are confided by the Legislature in the directors."

The question remains whether the resolutions passed by the board of directors relative to the sale of the patents are *ultra vires*. The plaintiffs challenge them on the ground that the corporation does not own the patents and therefore cannot sell them. The defendants concede this obvious truth.

The difficulty here arises from the somewhat novel device of the Ostlind Trust, which seems to have been the conception of the plaintiff Benjamin B. Ostlind and to have been adopted for the purpose of avoiding federal corporate income taxes. Whether it would have achieved that end may never be known, because the trust has never had any income. But it has created a situation in which the corporation is unable to control the disposition of property owned by it in common with its stockholders and which it would have had full and complete right and authority to deal with if the usual business practice had been pursued. The corporation has the power and authority to sell its one-fourth interest in the patents, theoretically at least, but the transfer of the full title will require the cooperation of all the interest-holders; and, as a practical matter, it may be assumed that a purchaser could not be found willing to pay $100,000.00 or any other substantial sum for a mere interest in the patents.

We think that the resolution authorizing Jarman to conclude a sale of the patents should be given a sensible construction and that, in view of similar authority previously voted by the interest-holders, all that was intended was to authorize a sale of the corporation's interest as part of the sale of the patents themselves. So interpreted, it is no more than a grant of authority to an officer of the corporation to act with its co-owners in the sale of property owned in common by the corporation and others.

While it is *ultra vires* for a corporation to be a member of a partnership (*Page-Dressler v. Meader,* 118 Or. 359, 367, 244 P. 308; *Salem-Fairfield Telephone Ass'n v. McMahan,* 78 Or. 477, 481, 153 P. 788; *Calvert v. Idaho Stage Co.,* 25 Or. 412, 415, 36 P. 24; *Hackett v.*

*Multnomah Ry. Co.,* 12 Or. 124, 129, 130, 6 P. 659, 53 Am. Rep. 327) ; it may, without exceeding its authority, become a co-owner with an individual in a business or enterprise within the scope of the corporate powers (*Calvert v. Idaho Stage Co.,* supra; *Hackett v. Multnomah Ry. Co.,* supra) ; and we can conceive of no reason why the corporation cannot cooperate with its co-owners in an endeavor to sell the property so owned in common, and, if deemed expedient, spend corporate funds for the purpose of bringing about such a sale.

 There is a distinction between the powers of the corporation itself and the powers of the board of directors, and an act may be within the powers of the former and not of the latter. 7 Fletcher on Corporations (Perm. ed.) 566, § 3401. The powers of directors are not unlimited but extend only to the ordinary or regular business of the corporation. *Railway Co. v. Allerton,* 18 Wall. (U. S.) 233, 21 L. ed. 902; 2 Fletcher on Corporations (Perm. ed.) 391, § 505. The sale of the corporation's last remaining asset, other than its cash, would not be, of course, the transaction of its ordinary business. See, *Matter of Timmis,* supra; *Consolidated Water-Power Co. v. Nash,* 109 Wis. 490, 85 N. W. 485. And it might well be doubted that the power to authorize the expenditure of corporate funds to promote such a sale lies with the directors. But we think that the stockholders may do so, and here the directors have acted merely in pursuance of the authority granted them in the resolution adopted by the stockholders at the annual meeting held on January 15, 1945.

The plaintiffs say in their brief that Jarman intends to spend all the money of the corporation to promote this sale, and refer to testimony given by Jarman which,

it is claimed, bears that construction. The resolutions, however, give him no such authority, and our decision goes only to the validity of the directors' action formally taken.

We conclude, therefore, that the action contemplated by the challenged resolutions is not in excess of the powers of the corporation, nor, in the circumstances, of the authority residing in the board of directors. It need hardly be added that the sale itself will not be valid unless made with the consent of two-thirds of the issued capital stock.

The decree of the circuit court is affirmed.