Argued September 9, modified and remanded December 30, 1976, petition for rehearing denied January 25, 1977

AMERICAN TIMBER & TRADING CO.,
*Respondent,*

*v.*

NIEDERMEYER et al, *Appellants.*

(No. 370-273, SC 23782-3)

AMERICAN TIMBER & TRADING CO.,
*Respondent/Cross-Appellant,*

*v.*

NIEDERMEYER et ux,
*Appellants/Cross-Respondents.*

(No. 377-470, SC 23782-3)

558 P2d 1211

[ 1136-a ]

[ 1136-b ]

*Thomas H. Tongue,* of Morrison, Dunn, Cohen, Miller & Carney, Portland, argued the cause and filed briefs for appellants/cross-respondents.

*Bradley Littlefield,* Portland, argued the cause for respondent/cross-appellant. With him on the briefs were Gerson F. Goldsmith, and Goldsmith, Siegel, Engel & Littlefield, Portland; and Henry A. Carey, Jr., Portland.

Before Denecke, Chief Justice, and McAllister, O'Connell, Howell, Bryson, and Lent, Justices.

HOWELL, J.

**HOWELL, J.**

This appeal involves two suits which were consolidated for trial. In the first suit, the plaintiff corporation, American Timber & Trading Co. (AT&T), seeks an accounting for funds diverted from the plaintiff corporation to the defendant corporation, Vancouver Timber Investment Co. (VTI) by defendant Ben E. Niedermeyer (Ben), a former director and majority stockholder of plaintiff corporation.[1] The second suit involves two separate causes of suit. One seeks an accounting for salaries, bonuses and "expenses" received by Ben from AT&T without corporate authority. The expenses primarily involved improvements to various residences owned by Ben. The second cause of suit seeks rescission of an exchange agreement which transferred certain AT&T properties to Ben in exchange for Ben's interest in several related companies or, alternatively, an accounting of the profits Ben realized on the transfer. Ben, in turn, asserted defenses of ratification, estoppel and laches and filed a counterclaim seeking the recovery of additional sums due him under several contracts with AT&T which had been executed in connection with the exchange agreement.

The trial court found that Ben's organization of VTI in Canada was wrongful and resulted in siphoning off $150,585 in profits that rightfully belonged to AT&T and that these funds should be returned with interest. However, the trial court concluded that AT&T was estopped from seeking a recovery of a total of $226,789 in salaries received by Ben from 1963 to 1969. The court found that AT&T, "by its acts and omissions, has acquiesced in and ratified salaries paid to B. E. Niedermeyer, Jr. and other officers and Directors." The court also found that AT&T derived a benefit from the rental of two vacation homes (known as the Gearhart and Packwood properties) from Ben and his wife and that the rental payments and the improve-

---

[1]The complaint also included Ben's wife, Elma Niedermeyer, as a nominal party defendant.

ments charged to AT&T were reasonable. The judge concluded that AT&T was "estopped from bringing any claim for corporate waste as to the Gearhart and Packwood properties." However, the court also found that AT&T's expenditure of $4,068 for remodeling Ben's home in 1968 was improper and unauthorized. The judge ruled that this expenditure constituted a waste of corporate assets and was a breach of Ben's fiduciary duties. The court decreed that AT&T should be reimbursed with interest.

The trial court also found that the transfer of corporate assets to Ben through the exchange agreement was without corporate authority. He also found that "the taking of these assets was wrongful, constituted corporate waste and constituted a breach of the fiduciary duty of B. E. Niedermeyer, Jr. to AT&T and its stockholders." The court further found that Ben's defenses of estoppel, waiver, ratification and laches had not been established by the evidence. The trial court concluded that Ben should account for all property received from the corporation under the exchange agreement. The decree imposed a constructive trust and ordered an accounting.

Finally, with respect to Ben's counterclaims on the noncompetition agreement, the employment contract and the insurance agreement, the court found "that the agreements upon which these claims are based were never submitted for the consideration of nor were they ever approved by AT&T's Board of Directors or stockholders." Therefore, the court concluded that the agreements were "null and void." However, the judge ruled that Ben "need not repay to the corporation those sums [$23,571] received under the purported agreements." The court also found that AT&T should repay Ben $6,337.18 plus interest for amounts he paid as guarantor of AT&T's debts to a third party.

Both parties have appealed from those portions of the decree which were adverse to their positions. We review de novo; however, when the testimony is in

conflict, we give great weight to the findings of the trial judge who viewed the witnesses and observed their demeanor. *See, e.g., Stangier v. Stangier,* 245 Or 236, 238, 421 P2d 693 (1966).

The trial of these suits lasted for six weeks and filled 17 volumes of transcript. There are literally hundreds of financial documents which have been included as exhibits. However, although some of the testimony was in conflict and although the parties frequently argue that different conclusions should be drawn from the same evidence, the basic facts are largely undisputed. The following is a summary of our review of the transcript and the exhibits.

Plaintiff corporation, AT&T, was incorporated in Oregon in 1948. The initial stockholders and directors were Ben and his two parents. The company engaged in various aspects of the lumber business as a subsidiary of Niedermeyer-Martin Co., which was also controlled by the Niedermeyer family. In 1963 a dispute arose between Ben and other members of the family, and Ben took over control of AT&T and had it separated from Niedermeyer-Martin. As part of the separation, certain other former Niedermeyer-Martin satellite companies which were controlled by Ben were merged into AT&T. Minority stockholders in these other companies became stockholders in AT&T.[2] Thereafter, Ben controlled 66% of the voting stock in AT&T, and he became the president and dominant force behind the company. In fact, the record shows that after Ben assumed control in 1963, corporate formalities which had formerly been followed were largely ignored, and Ben ran the company essentially as a one-man outfit.

Although the bylaws provided for three persons on

---

[2]The minority stockholders include both common and preferred stockholders. Some of the minority stockholders are members of the Niedermeyer family, others are company employees, and still others are completely unrelated to AT&T or the Niedermeyer family. The total number of persons owning some form of stock interest in AT&T was between 15 and 16 during the period in which Ben operated the company.

[ 1139 ]

the board of directors, Ben unilaterally increased it to five and appointed all its members without consulting the other shareholders, even though the amended bylaws provided for cumulative voting. The board of directors rarely met, and many of the meetings which are reflected in the corporation's minute book were never held. Salaries and bonuses for Ben and the other corporate officers were set by Ben, although the bylaws provided that officers were to receive "only such compensation as determined by the Board of Directors."

In 1966, AT&T had a contract with a Canadian supplier to purchase tent pole stock. After performance of the contract had started, Ben formed a Canadian corporation, Vancouver Timber Investment Co. (VTI), and substituted VTI for AT&T on the contract with the Canadian supplier.[3] He then secretly caused AT&T to purchase the tent pole stock through VTI, but the poles were shipped by the Canadian supplier directly to AT&T. The price paid to the Canadian supplier by VTI was substantially the same as under the original contract with AT&T, $130 per thousand board feet. However, Ben, through VTI, began charging AT&T $350 per thousand board feet. Although the price was later reduced to $175 per thousand, during the three years the contract was in force, these overcharges amounted to a total of $150,585. The effect of this manipulation was to secretly divert these funds from AT&T to VTI.

At about the same time, Ben caused AT&T to begin a pre-invoicing practice which involved the preparation of invoices for goods which had not yet been shipped. This resulted in overstating AT&T's accounts receivable without an offsetting decrease in inventory and this, in turn, allowed AT&T to obtain larger bank

[3] Ben formed the corporation with a nominal capitalization of $1,000. The evidence indicates that although his brother Walt was given a one-third interest in VTI, he knew nothing about the activities of VTI, and he never participated in the management of that company. Indeed, the record discloses that Walt never obtained possession of the shares which were nominally his and never benefited from their ownership.

loans under its financing agreement with the First National Bank. Another effect of this accounting manipulation was to increase the apparent net worth and income of AT&T. In addition to this pre-invoicing practice, on at least one occasion Ben created invoices for fictitious sales. In 1968, Ben made up $200,000 worth of false invoices and put them up as collateral for a loan. This deception was discovered, however, and reported to the bank, and the entries were eventually reversed.

Beginning in about 1964, Ben began leasing to AT&T two vacation homes which he and his wife had owned for several years. The amount of rent paid by AT&T was $140 per month for one home and $250 per month for the other. AT&T also made various improvement and repairs on both properties and purchased furniture for the homes as well.

In October, 1967, Ben suffered a serious heart attack. As a result of his illness and at the insistence of his doctor, Ben began considering retirement and the disposal of his interest in AT&T and several of the related companies which he had formed over the years. Ben's brother, Walt, who was a director and vice-president of AT&T and who also had an interest in some of the related companies, was approached by Ben and his brother-in-law, Don Sullivan, who was also a director. Ben contended that AT&T and its related companies were worth about two million dollars, and that his own interest in these companies was worth $1,400,000. However, Walt did not have enough assets to buy out the interest claimed by Ben in all these companies, even after the First National Bank offered to make him a personal loan of $200,000, and another director, Duane Autzen, agreed to put up an additional $200,000 as an undisclosed principal. Ben then conceived the idea of transferring his interest in some of the related companies directly to AT&T in exchange for some of AT&T's assets. Eventually, a deal was put together whereby Ben transferred his interest in AT&T to Walt in exchange for $400,000 cash and

Walt's 50% interest in Ben-Walt, a related company. Walt's interest in Ben-Walt was valued at $450,000. Ben's interest in some of the related companies—Utah Timber & Steel, Niedermeyer Bros., Pacific Lumber Agency, and Oregon American Leasing Corporation[4] —was then transferred to AT&T in exchange for all timberlands owned by AT&T in Oregon and Washington; an apartment house with a $40,000 equity; life insurance policies with a cash surrender value of $23,000; a 10-year non-competition agreement worth a total of $180,000; and a 10-year employment contract worth about $30,000. Walt and AT&T issued a joint and several promissory note for $140,000 as additional consideration to Ben, and Walt also agreed to have AT&T maintain the existing health insurance policies for Ben and his family. Under other terms of the exchange agreement, Ben was also to be released from several guarantees of AT&T debts which he had previously executed, and AT&T agreed to pay the attorney fees of all concerned in the exchange transaction. The agreement was reached on July 15, 1968, and the closing took place on August 30.

The record contains voluminous evidence relating to the negotiations leading up to the exchange agreement. Negotiations were conducted at arm's length and frequently through attorneys for Ben and Walt. Spread sheets were prepared by Art Smith, the controller of AT&T, which listed values for AT&T, its assets, and all of the related companies. There was testimony, however, that some of these appraised values were rather arbitrary and contrary to generally accepted accounting practices.

Although AT&T's assets were involved in the bargaining, the exchange agreement was essentially a deal between Ben and Sullivan on the one hand and Walt and Autzen on the other. Both sides were seeking their own private advantage. No one on the board of

---

[4] Notably, Ben retained his interest in VTI and induced Walt to transfer his nominal interest in that company back to himself.

directors was looking after the interests of the corporation or its minority stockholders and creditors. At the closing on August 30, the agreement was signed by Walt and Ben both individually and as directors and representatives of AT&T.

Following Ben's heart attack and throughout the period leading up to the negotiations and the exchange agreement, Ben was engaged in various schemes to siphon off money from AT&T through the related companies. Niedermeyer Bros. was operated in a manner similar to VTI, but on a smaller scale. Niedermeyer Bros., which owned Lichty Piling Co., an AT&T supplier, would increase AT&T's invoices from Lichty Piling 5% to 10% before passing them on to AT&T. No services were performed by Niedermeyer Bros. which would justify this surcharge. Ben also engaged in another scheme whereby he diverted funds from AT&T to Oregon American Leasing Company through Utah Timber & Steel. The record indicates that assets valued at under $15,000 and owned by Oregon American Leasing were transferred to Utah Timber & Steel for $125,000. Utah Timber & Steel obtained a Small Business Administration loan to finance the $125,000, and AT&T paid off the loan. The net effect of this transaction was to divert nearly the entire $125,000 from AT&T to Oregon American Leasing, which was wholly owned by Ben.

During the same period, Ben was making increasingly larger withdrawals for "bonuses" and salary from AT&T and the related companies. He also purchased liquor, furniture and clothing for his personal use and had them charged to AT&T. He began collecting on one of AT&T's contracts in his individual capacity at the rate of $400 to $500 per month and attempted to issue himself an extra check from AT&T for a personal vacation. Ben also charged Walt for some furniture for Ben's own home, and, when Walt complained, Ben issued Walt a $4,000 "bonus" from AT&T to cover the charge. A room over Ben's garage was converted into

an office for over $4,000 at AT&T's expense, even though Ben had already begun negotiations to sell the business. AT&T's accountants, who were conducting an audit at the time, eventually concluded that "Ben was trying to steal the company blind." Ultimately, all parties to the exchange agreement became aware of at least some of these various manipulations and improper withdrawals, and the date of the exchange agreement, July 15, 1968, came to be referred to as the "stop stealing date"—a phrase which, ironically, was coined by Ben's former attorney.[5]

Following the consummation of the exchange agreement, AT&T quickly began going downhill. The cause of its demise was attributed to different factors by different witnesses. However, the record indicates that the company's eventual failure was due to the combined effect of the depletion of AT&T's assets by the exchange agreement, the calling of AT&T's loan by the First National Bank, the loss of government contracts following the winding down of the Vietnam war, and the company's failure to cover its rapidly rising raw material costs when negotiating prices for future sales of finished goods.

AT&T lost approximately $500,000 from January 31, 1968, to January 31, 1969, the fiscal year in which the exchange agreement was executed. By 1970, the company had gone into the process of liquidation. Arthur Young & Company was then called in to conduct an audit investigation of AT&T. Despite a January 31, 1968, audited financial statement which had shown a net worth of $993,084.24, the auditors determined that liabilities would have exceeded assets if proper accounting practices had been employed, and they concluded that "AT&T had no net worth" as of the date of the 1968 financial statement. In other words, the company was insolvent even before Ben depleted its assets through the exchange agreement. The

[5]In fairness, it should be pointed out that Ben's present counsel were not involved in any of the events that took place prior to the filing of this suit.

auditors further concluded that AT&T would have shown no profit or earnings during the entire period from 1963 to 1968 if proper adjustments had been made to its balance sheets. Apparently, AT&T survived during that period only because of various accounting devices and manipulations which resulted in the overstatement of its assets. According to these accountants, AT&T's equity had actually been going down each year, and salaries and expenses were being paid out of bank loans. By the time of trial, all of AT&T's assets had been liquidated.

## The Exchange Agreement

On appeal, Ben contends that the exchange agreement and the employment contracts are valid and enforceable. He argues that they were approved by the board of directors and that stockholder approval was not necessary. Ben takes the position that the directors of AT&T had established a custom of taking corporate action informally and that the board of directors "in their customary informal manner did, in fact, approve and authorize the contracts."[6]

We disagree. Even if the actions of the individual members of the board of directors taken during the course of the negotiations would otherwise be legally sufficient to manifest their approval as a board, *see* ORS 57.791, 57.265; *First Nat. Bank of Burns v. Frazier,* 143 Or 662, 678-79, 19 P2d 1091, 22 P2d 325 (1933), we do not believe that such approval could be given effect in this case.

In 1968, the board of directors consisted of Ben, Walt, Don Sullivan, Duane Autzen and Marv Hutchins. Ben and his brother-in-law, Don Sullivan, were attempting to get as much out of the deal as possible for Ben. Similarly, Walt and Duane Autzen were

---

[6]Ben contends that AT&T was a close corporation and that such corporations are often permitted to act without a formal resolution of the board of directors. However, because of our determination of other issues raised by this appeal, we need not decide whether AT&T qualifies as a close corporation for this purpose.

seeking their own best advantage in the negotiations with Ben and Don Sullivan. Only one member of the board, Marv Hutchins, was actually disinterested, and the record contains no evidence that *anyone* ever stopped to consider the best interests of the corporation and its minority shareholders and creditors. Moreover, only Ben and Walt signed these agreements on behalf of AT&T. Hutchins, the only disinterested director, did not even attend the closing.

■■    Traditionally, because of their fiduciary duties, officers and directors were not allowed to contract with their corporation unless a disinterested majority of the board of directors approved, or the transaction was ratified by a vote of the stockholders. In the absence of such approval, the transaction was voidable at the option of the corporation even if made in good faith and without regard to the fairness of the transaction. *See, e.g., Ostlind v. Ostlind Valve, Inc.,* 178 Or 161, 185, 165 P2d 779 (1946); 3 Fletcher, Cyclopedia of Corporations 389-90, § 924 (Perm ed 1975). However, there has been a liberalizing trend toward enforcing contracts which otherwise would be voidable because of the relationship of the contracting officer or director to the corporation if, upon close scrutiny, the transaction is affirmatively shown to be fair to the corporation. This rule has recently been adopted in Oregon by statute. *See* ORS 57.265.[7] This change would allow the enforcement of contracts between a corporation and its directors even when it has not been approved by a disinterested board or ratified by the stockholders, so long as "the contract or transaction is fair and reasonable to the corporation." ORS 57.265(1)(c). *See also* Model Business Corporation Act § 41, in J. Moye, Business Organizations 407-08 (1974); H. Ballantine, Corporations 174-75, § 69 (rev ed 1946); Note, *Cor-*

---

[7] This statute was adopted in 1975 and, therefore, is not directly applicable to the transaction involved in this appeal. However, that statute is a codification of a trend in the case law toward a more liberal view of contracts between a corporation and its officers or directors which is more in keeping with needs and practices of modern business life.

*porations—Directors—Transactions Involving Conflicts of Interest,* 42 Or L Rev 61 (1962).

■   In this case the exchange agreement was not approved by a disinterested board of directors, and it was never submitted to the stockholders for a vote of ratification. Moreover, even a cursory analysis of that agreement in light of the evidence disclosed by the record clearly shows that it was manifestly unfair to AT&T and its minority stockholders. In exchange for Ben's interest in all the related corporations, which was valued by the parties on the spread sheets at $165,000, Ben took at least $220,000 worth of AT&T's physical assets.[8] Under other provisions of the exchange agreement, Ben was also to receive from AT&T a $180,000 non-competition agreement, a $30,000 employment contract, continued medical insurance, and monthly payments for office rental. The total value of these additional considerations, as found by the trial court, was $254,494.33. Similarly, the evidence produced by the accountants who testified at trial demonstrates that the value of Ben's interest in the related corporations was grossly overstated even at $165,000, and their testimony was reinforced by that of Art Smith, the company controller and the man who actually prepared the spread sheets. In light of the above evidence alone, it should be abundantly clear that Ben has not met his burden of proving that the exchange agreement was "fair and reasonable to the corporation."

■■   However, the record also discloses that Ben knew that the timberlands he took from the corporation at an "arbitrary" value of $157,000 had recently been appraised at $295,000. Significantly, Ben's testimony reveals that he did not disclose the $295,000 appraisal of AT&T's timberlands and used the "arbitrary figure" of $157,000 instead because "I am sure that if I put

---

[8]The spread sheets prepared at Ben's request by the company controller, Art Smith, assigned a value of $157,000 to the corporate timberlands, $40,000 for AT&T's equity in the Michele Apartments, and $23,000 for the cash surrender value of four life insurance policies on Ben's life.

down $300,000 I couldn't have made a deal." Ben's concealment of the true value of the corporate timberlands and his arbitrary evaluation of the property demonstrates not only a breach of his fiduciary duty to the corporation, but also a fraud on AT&T's minority stockholders and its creditors, as well as a waste of corporate assets which were vital to the corporation's continued existence.[9]

Ben contends that AT&T expressly or impliedly ratified the exchange agreement and the employment contract, that it is estopped from denying that these contracts were authorized, and that it is barred by laches. The trial court found that Ben had not established any basis for these defenses, and we agree with this conclusion.

Although shortly after the exchange agreement was consummated Walt and Autzen began to suspect that Ben had cheated them, AT&T never acquired any real knowledge that the exchange agreement was unfair or that Ben had been acting in bad faith until after Arthur Young & Company had conducted their audit investigation. Thereafter, AT&T acted with reasonable promptness to assert its rights and is not guilty of laches, and there is no basis for the application of an estoppel. Similarly, prior to the audit investigation, ratification would have been impossible. Unless there is knowledge of the material facts of all the conduct in question, ratification cannot occur. *See, e.g., Alldrin v. Lucas,* 260 Or 373, 381, 490 P2d 141 (1971); 2 Fletcher, supra § 756 at 1049. Moreover, when corporate waste is involved, ratification can be accomplished only by unanimous vote of all the stockholders. *See* n. 9, supra.

We conclude that the trial court was correct in ruling that the exchange agreement was unauthorized

[9] Unlike contracts which are otherwise voidable merely because of the relationship of the contracting parties to the corporation, contracts which are a fraud on the minority stockholders or which involve corporate waste can be ratified only by a unanimous vote of all the shareholders. *See, e.g.,* 2 Fletcher, Cyclopedia of Corporations 1083-86, § 764 (rev ed 1969).

and improper and that the assets which Ben received from the corporation should be returned. However, the trial court's decree also allowed Ben an offset of $157,000, which apparently reflects the court's determination of the value of the timberlands which Ben received from AT&T. If so, the trial court was in error in allowing the offset, for Ben should have been required to account for all assets he received from the corporation under the exchange agreement. The only offset allowable would be for the value of the assets he transferred to AT&T, i.e., Ben's interest in the related corporations.

The evidence as to the value of Ben's interest in these companies was disputed, and Ben has the burden of proof on this issue. The trial court made no finding as to the value of this interest, but, on appeal, Ben contends that he is "entitled to a credit equal to any amount he might owe AT&T" on the theory that there was an equal exchange of consideration. As we have already indicated, this is clearly not the case. Nor is Ben entitled to an offset for the value of his interest as reflected in the spread sheets. The corporation never agreed to these values, and the evidence indicates that the value of Ben's interest in these companies was grossly overstated. However, the evidence in the record is not sufficient to enable us to make an adequate evaluation of the actual value of Ben's interest in the related companies. Therefore, we believe that the trial court should hold an additional hearing to determine the proper value to be given Ben's interest in the related companies which were transferred to AT&T and that the court should allow Ben an offset against the judgment in this case for that amount.[10]

We have also noted that the trial court ruled that

---

[10]On remand, the relevant value for Ben's interest in these companies will be the actual value to AT&T of Ben's interest in each company at the time of transfer, rather than any apparent value that his interest might have had in the eyes of the parties to the exchange agreement.

Ben should be allowed to retain $23,571 which had already been paid to him under the non-competition agreement, the employment contract, the insurance agreement, and the payments for office rent. This ruling was in error. In its opinion, the court stated that the above agreements "are of no binding effect and are null and void." As we have previously indicated, we agree with this conclusion, and we find no basis for allowing Ben to retain any of the benefits of these agreements which he has already received. The decree should be modified so as to require the return of these additional funds.

Finally, the trial court determined that Ben should be allowed an offset for $6,337.18 for sums he incurred as guarantor of a corporate obligation to a third party. We agree with this conclusion.

## Vancouver Timber Investment Company

Ben also appeals from that portion of the judgment which relates to VTI and its effect in siphoning off $150,585 in profits from AT&T through its substitution for AT&T on the tent pole contract with the Canadian supplier. In his brief, Ben admits that "in retrospect the effect of VTI on AT&T appears questionable," and that "the *effect* of VTI on AT&T was the diversion of funds from AT&T to VTI," but he asserts that the establishment of VTI served a valid business purpose for AT&T. We are unconvinced that the secret diversion of funds from AT&T to a separate company in which it had no ownership interest could possibly serve AT&T's business interest. No extended analysis is necessary to show that any benefit AT&T derived from avoiding payment of taxes on the diverted funds would be more than offset by the loss of the diverted capital. The secret diversion of these funds to VTI was a clear and deliberate breach of Ben's fiduciary duty to AT&T and its other shareholders. It was a waste of corporate assets and a fraud on AT&T's minority stockholders and creditors. Under the terms of the exchange agreement, Ben acquired 100% of the stock

in VTI, and, despite his protestations to the contrary, the evidence discloses that Ben alone reaped the entire benefit of the diversion of funds from AT&T. The one-third interest which was nominally Walt's was transferred to Ben without any consideration. Although this transfer occurred in connection with the exchange agreement, the evidence is clear that throughout the negotiations VTI was treated as "Ben's company" and Walt's nominal interest was never actually involved in the exchange transaction. Moreover, Ben also received the benefit of all salaries, dividends and bonuses ever paid by VTI. We believe that the trial court correctly concluded that Ben should return the $150,585 in diverted funds to AT&T with interest.

## The Measure of Recovery

Next, Ben argues that equitable considerations should preclude granting AT&T any relief in these proceedings because Walt, who is now the majority stockholder, participated in the wrongdoing. Alternatively, Ben suggests that any relief allowed should be limited to a pro rata recovery equal to the percentage of ownership of the innocent shareholders.

Ordinarily, we would be inclined to agree that a majority stockholder who participated in the wrongdoing complained of should not be allowed to profit indirectly from the wrong by causing suit to be brought through the corporation. *See, e.g., Bangor Punta Operations, Inc. v. Bangor & Aroostook R.R. Co.,* 417 US 703, 94 S Ct 2578, 41 L Ed 2d 418 (1974); *Perlman v. Feldmann,* 219 F2d 173 (2d Cir), *cert. denied* 349 US 952 (1955). However, that does not appear to be the situation in this case. Ben acknowledges that AT&T has been liquidated and is now insolvent. Apparently the only real beneficiaries of this suit will be AT&T's creditors and its preferred stockholders. In our view, it is probable that after these claims are paid, little, if any, of the recovery in this case will remain to be divided among the common

stock owners.[11] Walt may be incidentally benefited to the extent that he would otherwise be liable on several personal guarantees of AT&T obligations, but it is doubtful that he will directly share to any substantial degree in AT&T's recovery.[12] Ben had the burden of proof on this issue, and he has not satisfactorily demonstrated that any unjust enrichment will result from this suit. *See REA Express, Inc. v. Travelers Ins. Co.,* 406 F Supp 1389, 1396, n. 6 (D DC 1976): "[T]he basis of *Bangor Punta* is avoidance of unjust enrichment, not deterrence of allegedly illegal or improper conduct." Consequently, we conclude that the principle of pro rata recovery is inapplicable in this instance.

### Accountants' Fees

The trial court awarded AT&T $43,950 to cover the fees of its accountants who testified as expert witnesses. The award was based on a stipulated statement of facts submitted by the parties at a supplemental hearing. The stipulation shows that the total bill from Arthur Young & Co. was $48,392 for its services in connection with both this suit and a federal 10b-5 securities[13] case brought by Walt in federal district court. The stipulation provides that the representatives of Arthur Young & Co. would testify that $43,950 of this amount was "necessarily incurred in connection with the above-entitled case" and would attribute the other $4,442 to their time spent preparing for the federal 10b-5 suit. Ben offered no contrary

---

[11] The record does not indicate the amount of creditors' claims outstanding. However, it does show that the preferred stock has a par value of $272,860 and that the preferred stockholders are also entitled to a cumulative dividend of 6% per year on this par value. This gives the preferred stockholders a total preference of $416,000 before the common stockholders will be entitled to receive anything. Moreover, the record indicates that attorney fees in the amount of $200,000 have already been allowed and these, too, will be paid out of the corporate recovery.

[12] Both Walt and Ben have small preferred stockholdings. Of the 3,093.6 shares of preferred stock, Walt owns 58 shares and Ben owns 265 shares.

[13] Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j.

evidence, but he now argues that this allocation is unreasonable.

We find that the record contains no evidence which would indicate that the trial court abused its discretion in accepting the allocation of costs made by Arthur Young & Co. as it appears in the stipulation. The series of secret financial manipulations which Ben engaged in between himself, AT&T, and the related companies made it necessary for AT&T to seek a complete examination of the company by a team of outside experts in order to uncover the extent of its losses which were attributable to breaches of Ben's fiduciary duties. The testimony of these experts was essential to the proper presentation of plaintiff's case, and without their investigation it is doubtful that the full extent of Ben's wrongdoing would have come to light. Under these circumstances, we certainly find no abuse of discretion in allowing these fees as costs. *See* ORS 20.020 and 20.030. *See also Ruth et ux v. Hickman,* 214 Or 490, 499, 330 P2d 722 (1958).

## *The Cross-Appeal*

In its cross-appeal, AT&T argues that it is entitled to recover all salary paid to Ben from 1963 to 1968 on the grounds that this salary was never properly authorized by the board of directors, and, alternatively, that as a matter of equity, Ben should be required to return all salary paid to him while he was engaged in a course of conduct which was in breach of his fiduciary obligations. AT&T also takes the position that it is entitled to a return of all payments for rent and improvements on two vacation homes which Ben leased to the corporation during his tenure as president, majority stockholder, and member of the board of directors.

The trial court found that AT&T was estopped from seeking to recover Ben's salaries because those salaries were reasonable and other officers and directors were aware of the payment of these salaries. The court also found that the corporation was estopped

from bringing a claim for corporate waste for payments made for rent and improvements on Ben's vacation homes because the rental payments were reasonable and the corporation derived a benefit from the use of the homes.

## Timeliness of Cross-Appeal

As a preliminary matter, Ben asserts that AT&T's cross-appeal was not filed in a timely manner and, therefore, that this court has no jurisdiction to consider the merits of the cross-appeal. Ben argues that the issues raised in the cross-appeal were finally determined by a decree entered on June 28, 1974, and were not affected by the "final decree" entered on October 31, 1974, following defendants' accounting. He takes the position that, since AT&T did not file a timely notice of cross-appeal from the initial decree, but only from the "final decree," it has lost the right to contest the issues raised in its cross-appeal. This contention is without merit. Interlocutory decrees, such as the one in question here, are not appealable. *See* ORS 19.010; *McEwen et ux v. McEwen et al,* 203 Or 460, 470-71, 280 P2d 402 (1955); *Froman et al v. Jones et al,* 141 Or 42, 44-46, 16 P2d 21 (1932); *Winters et al v. Grimes et al,* 124 Or 214, 216-17, 264 P 359 (1928). The cross-appeal was properly taken from the final decree entered on October 31, 1974.

## Ben's Salaries

From 1964 to 1968, Ben received a total of $226,798 in salaries from AT&T. The evidence is clear that these salaries were not determined by the board of directors, as the bylaws provide, but were set by Ben himself. However, the evidence is also clear that the board knew that these salaries, as well as those of the other officers, were being paid, and the amount of these salaries is reflected on the books of the corporation. We agree with the trial court's findings that these salaries were reasonable, that the corporation has ratified them through its acquiescence in the face

[ 1154 ]

of full knowledge of these payments, and that it is now estopped from seeking their recovery on those grounds.

However, a more difficult question is posed by AT&T's contention that Ben should be required to refund his salaries to the corporation as a matter of equity because of his numerous breaches of his fiduciary obligations which resulted in a serious diminution of the assets of the corporation. This is a separate and independent basis for recovery of executive salaries.

■■■ The remedy of restoration of compensation is an equitable principle and its applicability is dependent upon the individual facts of each case. *See, e.g., Lawson v. Baltimore Paint & Chem. Corp.,* 347 F Supp 967 (D Md 1972); *Lydia E. Pinkham Med. Co. v. Gove,* 303 Mass 1, 20 NE2d 482 (1939); 5 Fletcher, supra § 2145 at 635 (rev ed 1967). The general rule, however, is that a corporate officer who engages in activities which constitute either a breach of his duty of loyalty or a wilful breach of his contract of employment is not entitled to any compensation for services rendered during that period of time even though part of those services may have been properly performed. *See, e.g., Wilshire Oil Co. v. Riffe,* 406 F2d 1061 (10th Cir) *cert. denied* 396 US 843 (1969); *Lawson v. Baltimore Paint & Chem. Corp., supra; Frederick Chusid & Co. v. Marshall Leeman & Co.,* 326 F Supp 1043 (SD NY 1971); 5 Fletcher, *supra* § 2145 at 633-34 (1967), and § 2145 at 100-01 (Supp 1976); Restatement 2d of Agency § 469 and comment (e) (1958); Annot., 88 ALR2d 1437 (1963); Jacobs, *Business Ethics and the Law: Obligations of a Corporate Executive,* 28 Bus Law 1063, 1084-86 (1973).

■ We see no reason for making an exception to the general rule in this case. The equities are entirely on the side of the corporation and its minority stockholders and creditors. This is not a situation like that involved in *Richardson v. Blue Grass Mining Co.,* 29 F

Supp 658 (ED Ky 1939), *aff'd* 127 F2d 291 (6th Cir), *cert. denied* 317 US 639 (1942), where the court did not allow a recovery of compensation because of the "phenomenal" success of the corporation under the defendants' management. In this case, the continuing series of deliberate diversions of corporate funds, secret accounting manipulations, and other wilful breaches of Ben's fiduciary duties, which culminated in the looting of corporate assets through the exchange agreement, led almost inevitably to the collapse of AT&T. Rather than contributing to the success and profitability of the corporation, Ben's management of AT&T was largely responsible for its insolvency and eventual liquidation. *Compare Dale v. Thomas H. Temple Co.,* 186 Tenn 69, 208 SW2d 344, 350 (1948):

> "The Courts below have concurred in finding that the only service that the Caldwells rendered Apex was the wrecking of that Corporation by misappropriation of its corporate assets for their personal benefit. Therefore, under well-settled law, they were not entitled to salaries during the time of their control, Fletcher Cyc. Corp., Perm. Ed., Vol. V, Ch. 16, sec. 2145, and their division of the spoils is to be disregarded."

The evidence indicates that the pattern of serious and deliberate breaches of Ben's fiduciary duties began on August 15, 1966, with the formation of Vancouver Timber Investment Co. and its substitution for AT&T on the contract with the Canadian tent pole supplier, and that pattern continued until Ben withdrew from the company. Therefore, we conclude that Ben should be ordered to return to the corporation all compensation, whether in the form of salaries or bonuses, which he received from AT&T after August 15, 1966, with interest.

### The Vacation Homes

Finally, AT&T contends that the trial court erred in finding that it was estopped from recovering funds it paid for rent and improvements on the Gearhart and Packwood vacation homes. We agree with this contention.

■ It is apparent from the evidence that AT&T derived a benefit from the use of these properties through the goodwill that they generated when used by suppliers and customers. It appears that the corporation was also benefited when the homes were used by charitable and religious groups, and by employees of the corporation. Moreover, the amount of rent charged on each house, $140 and $250 each month, plus taxes and utilities, would seem to have been reasonable. However, the evidence also indicates that Ben charged AT&T about $40,000 for improvements and furniture for the two houses[14] and that, despite the AT&T lease, Ben and his wife continued to rent the homes to third parties as they had before. In fact, Ben's wife's testimony indicates that she never even knew that the houses had been rented to AT&T, and that her family continued to use the homes in the same manner as before. Finally, the evidence shows that the leases were never submitted for ratification to either the stockholders or to a disinterested board of directors. Therefore, we find that the leases and improvements made on the Gearhart and Packwood houses were unfair to the corporation and were not ratified by either the stockholders or the board of directors. Similarly, in light of the excessive expenditures for improvements on the two homes, and in light of Ben's continued use of the homes as his personal property, we find no equitable basis for the application of an estoppel in this case. We conclude that Ben must be required to refund to the corporation all payments which AT&T made in connection with the leasing of these two homes.

In summary, we conclude that the trial court was correct in determining that Ben should account for all property received from the corporation under the exchange agreement and that a constructive trust

---

[14]There was evidence that the auditors discovered some of the excessive expenditures for improvements and that they caused Ben's account with AT&T to be charged for those amounts. However, the evidence also reflects the fact that on the same day a credit was entered which partially offset the amount charged.

[ 1157 ]

should be placed on the proceeds. We also conclude that Ben should have been allowed an offset for the actual value of the assets which he transferred to AT&T, but should not have been allowed to offset $157,000 for the corporate timberlands. Similarly, we find that the trial court ruled correctly in determining that the non-competition agreement and the employment contract which were entered into in connection with the exchange agreement were "null and void." We also believe that Ben should have been required to return all payments made under those contracts, but that he is entitled to an offset of $6,337.18 for amounts he paid as guarantor of AT&T's debts to a third party. In connection with the Vancouver Timber Investment Co. claim, we find that the trial court correctly concluded that Ben and VTI must reimburse AT&T for the wrongfully diverted funds. However, we believe that Ben should also have been required to return to AT&T all sums which he charged the corporation in connection with the corporate leases on the Gearhart and Packwood vacation homes. We further conclude that Ben should have been ordered to return to the corporation all compensation which he received from AT&T after August 15, 1966, when the continuing series of deliberate and wilful breaches of his fiduciary duties began. Finally, we find no error in the trial court's allowance of $43,950 for accountants' fees as costs.

Modified and remanded for an additional accounting in accordance with this opinion.