Argued and submitted May 26, 1993, affirmed on appeal and on cross-appeal
June 22, 1994

DAMEROW FORD COMPANY,
an Oregon corporation,
*Appellant - Cross-Respondent,*

*v.*

Eugene BRADSHAW,
Associated Dealers Reserve, Inc.,
an Oregon corporation,
Lyman Slack Motors,
an Oregon corporation,
and Beaverton Subaru, Inc.,
an Oregon corporation,
*Respondents,*

*and*

Wallace L. PREBLE,
*Respondent - Cross-Appellant.*

(9002-00918; CA A72817)

876 P2d 788

Peter A. Ozanne argued the cause for appellant - cross-respondent. With him on the opening brief was Schwabe, Williamson & Wyatt. With him on the reply brief were Mildred J. Carmack and Schwabe, Williamson & Wyatt.

Susan J. Widder argued the cause for respondent Eugene Bradshaw. With her on the brief were Kerry M. Smith and Black Helterline.

Barbee B. Lyon argued the cause for respondents Associated Dealers Reserve, Inc., Lyman Slack Motors, Beaverton Subaru, Inc., and respondent - cross-appellant Wallace L. Preble. With him on the briefs were Jeanne M. Chamberlain and Tonkon, Torp, Galen, Marmaduke & Booth.

Before Deits, Presiding Judge, and Riggs, Judge, and Buttler,* Senior Judge.

BUTTLER, S. J.

---

* Buttler, S. J., *vice* Durham, J.

## BUTTLER, S. J.

Plaintiff Damerow Ford Company is a corporation engaged in operating an automobile dealership. It filed this action against Preble, the former owner of two-thirds of its stock and its former president and chief executive officer, and also against its former sales manager, Bradshaw. The remaining defendants are corporations in which Preble and Bradshaw held an interest and which allegedly presented conflicts of interest with plaintiff. The claims against Preble and Bradshaw are essentially for corporate waste, usurpation of corporate opportunities, breach of fiduciary duties and mismanagement, although they are alleged under various legal theories.

The trial court ultimately granted defendants' motions for summary judgment, and entered judgment for defendants on all of Damerow's claims, and judgment for defendant Preble for his attorney fees and on his counterclaim for a bonus. It dismissed all other claims, thereby determining all claims of all parties. ORS 19.010(2)(a). Damerow appeals the judgment dismissing its claims and the judgment for Preble for attorney fees and on his counterclaim for a bonus; Preble cross-appeals the judgment dismissing his claim for indemnity from plaintiff for attorney fees that he incurred in his lawsuit against Schwabe, Williamson and Wyatt to indemnify him for any damages that he might incur in this action. We view the record in the light most favorable to the party against whom summary judgment is sought. *Seeborg v. General Motors Corporation*, 284 Or 695, 699, 588 P2d 1100 (1978).

The underlying historical facts are not in dispute. George R. Francis (Francis) originally owned 100 percent of the stock in Damerow. In 1977, he sold 50 percent of the company's shares to Preble, who then became general manager with complete authority to run the business. Although Francis reduced his involvement, he maintained an office at Damerow and was on the premises about 20 hours a week, remained a director and served as chairman of the board for several years. Bradshaw, who had worked for Damerow since 1969 as sales manager, was told by Francis that he was under the supervision of Preble and was to take orders from him. Although Bradshaw had wanted to acquire an ownership

interest in Damerow, he was unable to do so, because neither Francis nor Preble was willing to decrease his interest in the company.

In order to give Bradshaw some other incentive to remain with the company, Preble and Bradshaw, with the knowledge of Francis, started several other businesses and acquired a financial interest in others. They formed and operated Associated Dealers Reserve, Inc. (ADR), to sell various forms of insurance to customers who purchase automobiles on credit. In 1987, they acquired a substantial interest in Lyman Slack Motors. They also became shareholders in Beaverton Subaru, Inc., of which Bradshaw became president and general manager. Those three corporations are defendants in this action. There were also other businesses in which they had an interest, but they are not parties.

In the early 1980's, Francis learned that Preble and Bradshaw were diverting money from Damerow to a fourth company that they owned. In 1984, Bradshaw admitted that they were "using Damerow's money * * * to finance the payroll" and were behind in repaying Damerow. When Francis objected to this practice, Bradshaw wrote Damerow a check for $92,029. Preble and Francis then entered into a "Stock Purchase and Redemption Agreement" under which Damerow redeemed half of Francis' shares, leaving Preble with two-thirds of the outstanding shares and Francis with one-third. The agreement also provided:

"Without the prior consent of [Francis], [Damerow] agrees that it will not advance funds * * * to any entity in which Corporation does not presently have an interest."

Subsequent to that agreement, Damerow claims that some money and property that should have gone to it were diverted to ADR, Lyman Slack and Beaverton Subaru. Francis was aware of some of the diversions, and objected to them.

In 1988, after consulting his attorneys, Francis sent a "Notice of Default" to Preble, asserting that Damerow had violated the Stock Purchase and Redemption Agreement by numerous diversions of its assets, listing them, without Francis' consent. Preble and Francis met with their attorneys several times. During that interval, Damerow entered into an

arrangement with Beaverton Subaru, to which Francis objected. Ultimately, they decided that they could no longer continue as co-owners of Damerow. On June 12, 1988, they entered into a "shotgun agreement," under which Preble was to set a price for Damerow's stock within 20 days and Francis had the option either to sell (put) his shares to Preble at the set price or to buy (call) Preble's shares at that price. The agreement also provided:

"6.    *Termination of Prior Agreements and Mutual Releases.*

"(a)    Upon the Closing of the put or the call of Damerow shares under this Agreement, the 1984 Agreement and the series of agreements collectively referred to as the 1977 Agreements will all simultaneously, and concurrently with the Closing under this Agreement, terminate and be of no further force and effect. In addition, and at the time of such Closing, it is intended by this Agreement that Wally (Preble) and Randy (Francis) each release the other from any and all past, present and future claims that each had, has or might in the future have against the other in respect of the 1984 Agreement, the 1977 Agreements or arising out of their respective positions as stockholders, officers and directors of Damerow. The parties shall, at the Closing, execute a separate mutual release to this effect if either party deems it necessary."

During the 20 days that Preble was to determine his price for the stock, Francis consulted with his attorneys and accountant, and also with Scott Thomason, an experienced automobile dealer in the Portland area. Thomason and Francis thought Damerow was worth between $7 and $8 million. However, Preble fixed its value at $6 million.

After studying that value, Francis and Thomason thought it to be low. Francis could buy Preble's stock for $4 million or he could sell his stock to him for $2 million. At that price, Francis decided that he would be better off to buy; he so elected. The transaction was closed on July 3, 1989. At the closing, the parties executed another release that had been prepared and reviewed by attorneys for all of the parties. Although it was prepared for Damerow's signature, as well as the signatures of Francis and Preble, Damerow did not sign it, and provisions relating to it were crossed out. There were numerous recitals relating to past dealings of both parties, to

which the other had objected, including, in general terms, those that are involved in this action. It then provided, in part:

> "(2)   Francis hereby releases, acquits and forever discharges Preble and his respective heirs, successors and assigns, none of whom admit liability, from any and all claims, demands, causes of action, suits, obligations, damages, expenses (including attorney fees) and liability of any nature whatsoever, known or unknown, that Francis has had in the past or now has, or might in the future have, against Preble arising out of or related to, directly or indirectly, (i) the 1977 Agreements and the 1984 Agreement, (ii) Preble's service as an officer or director of Damerow, (iii) Preble's ownership of shares of stock in Damerow or (iv) derivative claims which Francis could bring in the name of Damerow for misappropriation of corporation opportunity.
>
> "* * * * *
>
> "(6)   Each of the parties expressly understands and acknowledges that it is possible that unknown damages, losses or claims may exist, or that present damages, costs, losses or claims may have been underestimated in either amount or severity. Each of the parties has taken these possibilities into account in determining the consideration for the giving of this Release. The consideration for this Release, having been bargained for between the parties with knowledge of the possibility of such unknown claims, is given in exchange for a full accord, satisfaction and discharge of all such claims identified above in paragraph 2 and 3."

Six months after taking control of Damerow and after further investigating its finances, Francis caused Damerow to file this action against defendants seeking between $7 million and $12 million in damages. The trial court granted defendants' motions to dismiss the conversion claims for failure to state a claim, but did not decide defendants' claim that the statute of limitations had run. After plaintiff filed its second amended complaint, the trial court granted defendants' motions for summary judgment on all claims, applying the principles enunciated and applied by the United States Supreme Court in *Bangor Punta Operations v. Bangor & A.R. Co.*, 417 US 703, 94 S Ct 2578, 41 L Ed 2d 418 (1974). In that case, Bangor Punta had sold its 99 percent interest in the plaintiff railroad to another corporation, which then caused the railroad to sue Bangor Punta for damages alleged to have

been caused by its mismanagement of the railroad and by misappropriation of its assets.

In holding that the plaintiff could not maintain the action, the Court stated that it was a "settled principle of equity that a shareholder may not complain of acts of corporate mismanagement if he acquired his shares from those who participated or acquiesced in the allegedly wrongful transactions." 417 US at 710. The purchaser's shares are treated as tainted shares; if the seller of the shares may not maintain an action for the wrongful transactions, neither may the buyer. The Court then stated:

> "This principle has been invoked with special force where a shareholder purchases all or substantially all the shares of a corporation from a vendor at a fair price, and then seeks to have the corporation recover against that vendor for prior corporate mismanagement." 417 US at 710.

That principle, the Court said, is designed to prevent a windfall and unjust enrichment to the one who purchased the stock for fair value. The Court disregarded the corporate fiction in order to prevent the new owner from accomplishing what he could not otherwise accomplish: "Thus, where equity would preclude the shareholders from maintaining an action in their own right, the corporation would also be precluded." 417 US at 713. Although the parties refer to the *"Bangor Punta* principles," that decision did not originate them. As the Court said, they were well established and were applied in *Home Fire Ins. Co. v. Barber,* 67 Neb 644, 93 NW 1024 (1903).

Here, the trial court, in applying *Bangor Punta* principles, pointed out that, because Francis would be the sole beneficiary of any recovery, he was the real party in interest; it held that the corporate veil should be pierced and that the court should look at the substance of the transaction. It concluded that Francis, as to the 67 percent of the shares he had acquired from Preble, may not complain of acts of corporate mismanagement, because Preble had participated in the alleged misconduct. Because Preble could not maintain the action, neither could Francis, at least as to the 67 percent of the shares he had purchased from Preble.

■ Plaintiff argues that Oregon has rejected the principles enunciated in *Bangor Punta,* relying on *North v. Union*

*Savings & Loan Ass'n*, 59 Or 483, 117 P 822 (1911). That case involved a stockholder's derivative action in which the plaintiff had acquired his stock *after* the alleged wrongful conduct had occurred. The issue was whether it was necessary, in order to maintain such an action, for the plaintiff to have been a stockholder at the time of the wrongful conduct, which was the rule in the federal courts. The court held that it was not. It did not consider the *Bangor Punta* principles,[1] because they were not involved in that case. Aside from the fact that *North* is no longer the law, ORS 60.261(1),[2] cases that have permitted derivative actions brought by stockholders who acquired their shares *after* the alleged wrongdoing have recognized exceptions, notwithstanding the deterrent value of permitting the action to proceed. For example, if the complaining shareholder acquired his shares from one who approved of the wrongful conduct, *Pollitz v. Gould et al*, 202 NY 11, 94 NE 1088 (1911), or if he was aware that the prior holder had barred his right to seek relief, then he, too, would be precluded from seeking relief. *Parson et al v. Joseph*, 92 Ala 403, 8 So 788 (1891). In other words, the tainted shares rule would apply, even if the plaintiff's shares were purchased after the wrongdoing had occurred, notwithstanding the desirability of deterring corporate wrongs.

The court in *Bangor Punta* considered the deterrence factor and rejected it, stating:

> "If deterrence were the only objective, then in logic any plaintiff willing to file a complaint would suffice. * * * The only prerequisite would be that the plaintiff agree to accept the recovery, lest the supposed wrongdoer be allowed to escape a reckoning." 417 US at 717.

It went on to point out that the real beneficiary of an award of damages would have been the holder of 99 percent of the corporation's stock, who had acquired the stock at a fair price and, therefore, would be unjustly enriched. Here, Francis, as

---

[1] Of course, *Bangor Punta* had not yet been decided, but *Home Fire Ins. Co. v. Barber, supra*, on which *Bangor Punta* relied, had been.

[2] ORS 60.261(1) provides:

"(1) A person may not commence a proceeding in the right of a domestic or foreign corporation unless the person was a shareholder of the corporation when the transaction complained of occurred or unless the person became a shareholder through transfer by operation of law from one who was a shareholder at that time."

the owner of 100 percent of Damerow stock, would be the only beneficiary.

■    Nevertheless, plaintiff argues that deterrence should be the controlling factor in this kind of case; therefore, we should not follow *Bangor Punta.* No Oregon court has been called upon to consider the *Bangor Punta* principles and, as plaintiff points out, Oregon courts are not bound to follow it. *State v. Kennedy*, 295 Or 260, 267, 666 P2d 1316 (1983). Although we agree that deterrence is a consideration, the right of minority stockholders or creditors to seek redress in a derivative action against erring corporate officers for injuries done to the corporation is a potent weapon to achieve that objective. The trial court offered plaintiff the opportunity to amend the complaint to name Francis as the plaintiff to maintain the action as a minority shareholder owning one-third of the shares of Damerow for damages to him as the owner of those shares. Francis declined the offer.

■    Because no Oregon appellate court has either adopted or rejected the principles enunciated in *Bangor Punta*, we write on a clean slate. As a general proposition, the tainted shares doctrine sweeps more broadly than is necessary in this case. Applied literally here, Francis would be barred simply because he purchased two-thirds of his shares from Preble, who could not maintain an action because he and the other defendants participated in the alleged wrongdoing. Because Preble would be precluded, so would Francis. We need not decide here whether to adopt that broad rule.

■    However, we believe that when the purchaser buys shares from one whom the purchaser knows, or has reason to believe, has engaged in, or has acquiesced in, corporate wrongdoing, he or she is not a *bona fide* purchaser without notice of those facts; therefore, the purchaser may not maintain the action. Accordingly, we will apply the tainted shares rule in that form.[3] There is no genuine issue of fact as to whether Francis had reason to believe that Preble had engaged in acts that Francis believed amounted to corporate wrongdoing; he simply did not know the extent of it. Therefore, he may not maintain the action and, because he may not, neither may Damerow.

---

[3] Plaintiff cites no cases that purport to apply this aspect of *Bangor Punta.*

■ Even if we were to reject the tainted shares rule completely, the related principle enunciated in *Bangor Punta* bars plaintiff's action against Preble: When a shareholder purchases all or substantially all of the shares of a corporation at a fair price, the purchaser may not have the corporation recover against the vendor for prior corporate mismanagement. Plaintiff argues that that rule does not apply here, because Francis did not acquire "all or substantially all" of his Damerow stock from Preble. Although it is true that Francis only acquired two-thirds of his stock from Preble, he acquired all of the outstanding shares that he did not own. After he acquired Preble's stock, he owned 100 percent of the Damerow stock outstanding. The result is the same in either case. If the corporation were permitted to maintain this action, and if it were to prevail, Francis would be the sole beneficiary of the damages awarded. If the corporation recovered $7 million, Francis would have acquired complete ownership of Damerow for nothing and, in addition, would receive $3 million. Assuming that he paid fair value for Preble's stock, he got what he paid for, would receive a windfall and would be unjustly enriched. The rule applies here, and we adopt it.

■ Plaintiff contends that, in any event, there are genuine issues of fact as to two possible exceptions suggested by the court in *Bangor Punta*: The purchaser of the shares (Francis) received less than full value for his money, or that the alleged acts of prior mismanagement had a continuing effect on the corporation. Whether Francis received fair value depends on the value of Damerow at the time when he purchased Preble's shares. After the "shotgun" agreement was signed and pending Preble's determination of the price, Francis consulted with his attorney and his accountant and with Thomason, an owner of several established automobile dealerships. He and Thomason agreed that Damerow, as it then existed, was worth between $7 million and $8 million. When Preble placed the value at $6 million, which Francis and Thomason thought was low, Francis elected to buy Preble's interest rather than have Preble buy his one-third interest at that value. In *Delaney v. Georgia Pacific*, 42 Or App 439, 601 P2d 475 (1979), we said that the value set by a similar agreement (characterized as a "Russian roulette" buy-sell agreement) was the most persuasive, although not

the only, evidence of value, because the one who sets the value must accept or pay that price, depending on the election of the other.

Here, Francis offered no evidence of the value of Damerow at the time he purchased the shares. In an affidavit, he explained that he had not undertaken a due diligence investigation of Damerow, because he was unaware of the extent to which Preble had misappropriated the company's assets, and that it was not until after the purchase was completed that he caused an audit to be performed. As a result of that audit, he found that financial statements that Preble had given him before the purchase "reflected a figure for Damerow's used car inventory which is approximately $300,000 higher than its actual value." From that, he concluded that he had "paid more than fair market value for the shares" that he purchased in 1989. Accepting that evidence at face value, the record shows that Francis and Thomason, relying on financial statements provided by Preble, determined that the value of the company was between $7 million and $8 million; after the transaction was closed, a more thorough audit indicated that the used car inventory was worth about $300,000 less than their earlier evaluation. Even deducting that amount from the earlier evaluation, the revised evaluation remains substantially more than what Francis paid. Thomason testified that the price was a "good deal," even considering everything that Francis ultimately learned. We conclude that there is no genuine issue of fact as to whether Francis paid more than fair value for Preble's stock.

■　　　　The evidence relating to whether the prior mismanagement had any continuing effect on the corporation[4] also falls short of presenting a genuine issue of fact. It is clear from the record that Preble and Bradshaw, after leaving Damerow following Francis' acquisition of all of the Damerow stock, continued to operate the various businesses about

---

[4] That rationale is suggested in *Parson v. Joseph, supra.* Although the court in *Home Fire Ins. Co. v. Barber, supra,* appears to have applied that reasoning with respect to transactions that were concealed from the purchaser of the stock, it did not expressly say that in its holding. The result, however, with respect to the transactions that were secret, was that, because the purchaser had no knowledge of those wrongdoings by the seller, the corporation could maintain the action. *See* quotation *infra,* 128 Or App at 618.

which Francis had complained. There is nothing in either of the agreements signed by Francis and Preble in connection with the sale of Preble's stock that prohibits their doing so, notwithstanding Francis' previous complaints that they were engaged in the activities of which Damerow now complains. Francis submitted an affidavit in support of this aspect of plaintiff's claim, stating that a $269,000 check payable to defendant ADR was "diverted" to defendant after Francis acquired Preble's stock. On the face of it, the check belonged to ADR. The only evidence is that the check represented the proceeds from ADR's sale of an asset that had occurred before Francis acquired Preble's stock and was received afterwards. There is no evidence to the contrary. In fact, the record contains a memorandum from the attorneys for Damerow and Francis, whom Preble and Bradshaw had consulted in setting up ADR, stating that the earnings of that corporation "are not 'properly' the earnings of Damerow Ford."

■ Finally, plaintiff contends that its conversion claims were improperly dismissed and that the *Bangor Punta* principles do not apply to claims for the conversion of corporate assets. It relies on *Home Fire Ins. Co. v. Barber, supra*, which the Supreme Court discussed and applied in *Bangor Punta*. It is true that in *Home Fire* the Nebraska court, after holding that the plaintiff could not maintain the action for most of its claims because any recovery would benefit the stockholders, who would receive a windfall, permitted the plaintiff to recover for money that Barber had withdrawn from the corporate account and had "converted to his own use." The court purported to distinguish the latter claims on the basis that permitting the corporation to recover would benefit only the corporation. That distinction appears to us to be tenuous: increasing the corporate assets benefits the shareholders.

We believe that the court's rationale for its holding is more clearly explained when it said:

"If Barber (the seller of the stock) concealed and covered up these transactions by availing himself of the opportunities afforded him as secretary and manager of the company, and they were not discovered until a change in management resulted in an investigation of the books, we see no reason why the company should not recover the sums so appropriated." 93 NW at 1053.

■ We understand that language to mean that when, as a result of transactions that were covered up and were not reflected in the corporate records, those records reflected greater corporate assets, as a result of which the purchaser of the shares paid more than their fair value. Under those circumstances, the corporation may recover. That interpretation is vaguely suggested in *Noland v. Barton,* 714 F2d 315 (10th Cir 1984). If the court meant to say that the conversion of corporate assets differs from the diversion of its assets, we reject the distinction. We have already decided that there is no genuine issue of fact as to whether Francis paid fair value. The conversion claims were properly dismissed.

We affirm the judgment dismissing Damerow's complaint against Preble.

■ As to the complaint against Bradshaw, ADR, Beaverton Subaru and Lyman Slack, plaintiff contends that *Bangor Punta* has no application, because none of those parties ever owned any Damerow stock. However, Francis is the real party in interest. Because he acquired 67 percent of his stock from Preble, under the modified tainted shares principle that we adopt, he has no greater rights as to those shares than Preble had. Because, according to plaintiff, Preble participated with those defendants in the alleged wrongdoing, Preble could not maintain an action against them. Accordingly, neither Francis nor Damerow may do so. Plaintiff declined the trial court's offer to permit the complaint to be amended to name Francis plaintiff in a derivative stockholders action with respect to the shares that he owned before he purchased Preble's shares. Therefore, we affirm the trial court's granting those defendants' motions for summary judgment.

■ Plaintiff also appeals from the judgment for Preble on his counterclaim for a bonus for the time that he worked for Damerow during 1989 before he sold his stock to Francis. Plaintiff's answer asserted that Preble was not entitled to a bonus because, among other things, he had breached his fiduciary duty to plaintiff, and that, in any event, he was not entitled to $108,843, as he claimed. On Preble's motion for summary judgment, the trial court initially concluded that there was a genuine issue of fact as to whether Francis was entitled to a set off based on a miscalculation of the bonus, and ordered a trial on that issue. Following that limited trial,

the court granted Preble's renewed motion for summary judgment.

Assuming that a breach of fiduciary duty would be a defense to Preble's claim, *American Timber v. Niedermeyer*, 276 Or 1135, 558 P2d 1211 (1976), Preble points out that Francis and Damerow acknowledged Preble's right to a bonus when the parties closed their "shotgun" agreement on July 3, 1989. In addition to the release signed by Francis and Preble on that date, they both signed this document:

> "CONSENT OF DIRECTORS
> DAMEROW FORD CO.

> "WHEREAS, the Board of Directors of Damerow * * * has been reduced to * * * Preble and Francis;

> "WHEREAS, Preble is terminating his stock ownership interest in the Company, as well as his employment, effective this date;

> "WHEREAS, the Board deems Preble deserving of additional compensation during the period of his 1989 calendar year employment;

> "NOW, THEREFORE, BE IT RESOLVED, that Preble shall be entitled to additional compensation payable by the Company, said additional compensation to be at the rate of 30% of Damerow's net income before taxes for the period January 1, 1989 through June 30, 1989.

> "BE IT FURTHER RESOLVED, that the net income of Damerow for such period shall be estimated; and the Company shall deduct payments heretofore made to Preble as his said calendar 1989 compensation; and further, payment of additional compensation shall be made to Preble on January 1, 1990.

> "Dated this 3d day of July, 1989.

> > "/s/ Wallace L. Preble

> > "/s/ George R. Francis"

Plaintiff argues that that document does not constitute a contract. Whether or not it was a contract, by signing it, Francis and Damerow acknowledged Preble's right to a bonus for the six months that he worked for Damerow in 1989, and waived any objection that either might have, regardless of any earlier breach by Preble of his fiduciary duty to Damerow. That resolution and the mutual release of all claims, known

and unknown, were executed 16 months after Francis had sent the Notice of Default to Preble complaining about the matters now asserted to have been breaches of Preble's fiduciary duty. The trial court did not err in deciding that there is no genuine issue of fact as to Preble's right to a bonus.

Nevertheless, plaintiff contends that there are genuine issues of fact as to the amount of the bonus, listing, without amplification, eight matters in dispute. The record shows that Preble had been receiving bonuses, at least since 1984, pursuant to his 1984 agreement with Francis, which provided that the bonuses were to be calculated "using the same accounting practices presently employed by [Damerow]." Preble received bonuses every year thereafter that were calculated according to the 1984 accounting practices. Plaintiff argues that Preble's bonuses had been improperly calculated, relying on the testimony of an accountant, who said that the manner in which Preble's bonuses had been calculated was not in accordance with "generally accepted accounting principles." However, the 1984 agreement provided for the use of "the same accounting practices presently employed" by Damerow.

Although we agree with the trial court that there is no genuine issue of fact as to Preble's right to a bonus, whether, viewing the record in the light most favorable to plaintiff, there is a genuine issue as to how the bonus was to be calculated is more problematical. Plaintiff does not contend that the 1989 resolution provided a method of calculating the bonus that is different from the method specified in the 1984 agreement. Rather, it contends that the phrase "using the same accounting practices presently employed by" Damerow, as used in the 1984 agreement, required the use of generally accepted accounting principles. If that is correct, then there is evidence that Preble has been overcompensated since 1984, and plaintiff contends that it is entitled to set off the amount of the overpayments against any bonus to which he might be entitled for 1989, using generally accepted accounting principles. Although plaintiff's expert stated that the accounting practices that Damerow had been using did not conform to generally accepted accounting principles, and that, if generally accepted accounting principles were used, Preble's bonus would have been less, he agreed that by using

the "same accounting practices" used by Damerow in 1984, his bonuses had been properly computed.

■ The language used in the 1984 agreement is clear and unambiguous. The parties followed it until they had a parting of the ways. On this record, there is no genuine issue of material fact as to how Preble's bonus was to be computed. In its reply brief, plaintiff argued for the first time that Francis and Preble had agreed to deduct their debts to Damerow from bonuses, and that Preble still had an outstanding debt that should be deducted from his 1989 bonus. The only evidence adduced by plaintiff in support of that contention is Francis' conclusory statement in an affidavit that "Preble was indebted to Damerow in 1989." That is not sufficient to raise a genuine issue of material fact. The trial court did not err in granting summary judgment on Preble's claim for his 1989 bonus.

■ Plaintiff also assigns error to the trial court's awarding attorney fees to Preble incurred in the defense of this case. Preble relies on ORS 60.394, which provides:

> "Unless limited by its articles of incorporation, a corporation shall indemnify a director who was wholly successful, on the merits or otherwise, in the defense of any proceeding to which the director was a party because of being a director of the corporation against reasonable expenses incurred by the director in connection with the proceeding."

Damerow's Restated Articles of Incorporation also require indemnification of officers and directors who are sued because they are officers or directors. Plaintiff argues that Preble does not come within the protection of those provisions, because he was not made a defendant in this action because he was an officer or director of Damerow. However, many of plaintiff's allegations in its various complaints belie that argument. It might be that plaintiff *could* have brought this action against Preble, even if he had not been an officer and director of Damerow; however, it did not do that. Plaintiff also argues that no attorney fees should be awarded, because the dismissal of Damerow's claims was not a determination of his innocence or that his interests were entitled to protection. However, ORS 60.394 provides for attorney fees if the director was wholly

successful "on the merits or otherwise."[5] In *Sabre Farms, Inc. v. Jordan*, 78 Or App 323, 717 P2d 156 (1986), we affirmed an award of attorney fees to the defendants, who prevailed, in part, because of laches. The trial court did not err in awarding Preble his attorney fees.[6]

■     Finally, plaintiff assigns error to the amount of attorney fees awarded Preble, arguing that, because the case was ultimately disposed of primarily on the *Bangor Punta* principles and the release agreement, Preble's attorneys should have made their motions for summary judgment at the outset. That argument is based on hindsight, and we will not belabor a response. The trial court was in the best position to evaluate the attorneys' services and we cannot say that it failed to exercise its discretion properly in fixing the amount. *Express Creditcorp v. Oregon Bank*, 95 Or App 121, 125, 767 P2d 493 (1989).

Plaintiff's remaining assignments are moot.

■     In his cross-appeal, Preble contends that the trial court erred in not awarding him attorney fees that he incurred in pursuing an indemnity claim in a separate lawsuit against the attorneys who were attorneys for plaintiff and Francis and who were also attorneys for him and Bradshaw when ADR was incorporated and stock was issued to him and Bradshaw, but not to Francis or Damerow. Preble filed that lawsuit, because plaintiff's complaint in this action alleged that Preble's role in ADR violated his fiduciary duty to plaintiff. In that action, he claimed that if anything was wrong with the ADR transaction, those attorneys were negligent in not advising him of that fact; he sought to recover the amount of damages for which he might be found liable in this case. The trial court held that that matter was a separate

---

[5] ORS 60.394 is based on the Revised Model Business Corporation Act (1984), the Official Comment to which states:

"While this standard may result in an occasional defendant becoming entitled to indemnification because of procedural defenses not related to the merits — the statute of limitations or disqualification of the plaintiff, it is unreasonable to require a defendant with a valid procedural defense to undergo a possibly prolonged and expensive trial on the merits in order to establish eligibility for mandatory indemnification." Official Comment, § 8.52, Model Business Corporation Act Annotated.

[6] Damerow does not argue that the 1984 agreement has been rescinded for purposes of the issue we discuss.

claim against defendants who were not parties to this lawsuit. We agree and affirm the denial of attorney fees and expenses incurred by Preble in connection with that matter.

Affirmed on appeal and on cross-appeal.